**Dossie Wayne KEMP et al., Appellants,**

v.

**Lee Roy BEASLEY et al., Appellees.**

**No. 19782.**

United States Court of Appeals,
Eighth Circuit.

March 17, 1970.

John W. Walker, Little Rock, Ark., for appellants, John T. Lavey, Burl C. Rotenberry and Philip E. Kaplan, Little Rock, Ark., Jack Greenberg, Michael Meltsner and Norman Chachkin, New York City, were on the brief.

William I. Prewett, El Dorado, Ark., for appellees, Robert V. Light and Herschel H. Friday, Little Rock, Ark., were on the brief.

Before BLACKMUN, GIBSON and LAY, Circuit Judges.

BLACKMUN, Circuit Judge.

This school integration case is before us for the third time.

Through the school year 1964–65, 11 years after the decision in Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and 10 years after the decision in Brown v. Board of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), with its enunciation, at pages 300–301, 75 S.Ct. at 756, of a school district's duty to provide a system of nonsegregated schools with "good faith compliance at the earliest practicable date" and "with all deliberate speed", and 6 years after the decision in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958), with its emphasis, at page 7, 78 S.Ct. at 1404, upon "arrangements pointed toward the earliest practicable completion of desegregation", the El Dorado, Arkansas, School District Number 15 was still operating a racially segregated school system. There were two senior high schools, one black and one white; three junior high schools, one black and two white; and 13 elementary schools, six black and seven white, and there were dual attendance zones.

But by that time, the plaintiffs had instituted their federal court action seeking injunctive relief from this discrimination. The district court ruled that the plaintiffs were entitled to relief and directed the defendants (hereinafter referred to collectively as the "District") to eliminate segregation with all deliberate speed. A desegregation plan, after revision and amendments, was approved by the district court on April 29, 1965. The plan embraced a form of freedom of choice, beginning with the lower grades, over a three-step transitional period with full effectiveness in the 1968–69 school year, but it contained no provision for faculty desegregation. The plaintiffs

appealed, challenging freedom of choice as an acceptable method of desegregation, the particular application of freedom of choice under the plan, and the absence of any provision as to faculty.

This court, in what we have come to call Kemp I, being Kemp v. Beasley, 8 Cir., 352 F.2d 14, an opinion by Judge Gibson filed October 27, 1965, ruled, among other things, (1) that the plaintiffs were deprived of equal protection if they were not allowed to attend schools on a nonsegregated basis; (2) that a three-year transitional period was not in itself unreasonable and was permissible; (3) that, however, the plan proposed denied equal protection to a large number of pupils (particularly those then in the 11th and 12th grades) and should not have been approved; (4) that "The time for delay of individual rights is past"; (5) that "at this late date the administrative problems of the Board may not be used as a tool to deprive individuals of their long denied right to attend nonsegregated schools"; (6) that the plan must provide for immediate integration of the 11th and 12th grades, for integration of at least four more grades the following year, and for integration of all remaining grades by the second year; (7) that at that stage freedom of choice was permissible although the method "has fatal faults"; (8) that dual zoning is unconstitutional; (9) that the plan was also defective in failing to provide a nonracial basis for assignment of pupils who did not exercise freedom of choice; and (10) that it was the duty of the board to propose an acceptable plan, with complete details, "without further order from the Court" and to place that plan in operation "not later than the beginning of the second half of the 1965–66 school year." The case was remanded to the district court for further proceedings.

A revised plan was filed in December 1965. In January the district court ordered faculty integration to commence the following September. That court approved the revised plan in August 1967. Again, the plaintiffs appealed.

This court, in what we have come to call Kemp II, being Kemp v. Beasley, 8 Cir., 389 F.2d 178, an opinion by Judge Lay filed January 9, 1968, then ruled, among other things, (1) that "transitional periods for gradual integration of grades and faculty are no longer meaningful excuses" ; (2) that "we are still not persuaded that such plans [freedom of choice] are objectionable per se"; (3) that, however, "the only permissible program is one that works" in the constitutional sense; (4) that "If desegregation continues at the present pace, the District Court is instructed to see that affirmative steps be taken to supplement or substitute for the current program"; (5) that it is not the role of this appellate court "to direct the actual means by which this is to be accomplished"; (6) that "the burden is on school officials to make work whatever plan is adopted"; (7) that after three years "we fail to see any substantial progress in the elimination of the dual attendance zones"; (8) that the record contained insufficient evidence to support the plaintiffs' charges as to small and inadequate schools and as to a major discrepancy between white and black schools in pupil-teacher ratios; (9) that the plan was deficient because it expressed no commitment to correct present racial imbalance in faculties; (10) that the District was asked to submit to the trial court by August 1, 1968, faculty assignments for the following school year which would effectuate "the measure of racial balance necessary"; (11) that faculty selection "must remain for the broad and sensitive expertise of the School Board and its officials", but refusal to transfer or assign "cannot be justified on the argument that educational standards would thereby be lowered"; (12) that it "is misleading to think that '[racial] balance' means exact symmetry or equilibrium of the races", for percentages, although appealing, "lack that equitable flexibility which is still needed for a selective distribution of qualified teachers for particular faculty roles"; and (13) that complete faculty

desegregation was to be accomplished by the beginning of the 1969–70 school year. Again the case was remanded to the continuing jurisdiction of the district court.

On March 29, 1968, the District petitioned for approval of a still further revised plan. The plaintiffs again filed objections.

On May 27 the Supreme Court issued its decisions in Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968); Raney v. Board of Educ., 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); and Monroe v. Board of Comm'rs, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). The Court held that the school board has the burden to provide a plan which promises realistically to work now; that where freedom of choice offers real promise of achieving a unitary and non-racial system, there might be no objection to allowing it to prove itself in operation; that, however, where there are other methods reasonably available which promise speedier and more effective conversion to a unitary system, freedom of choice is not acceptable; and that the plans then before the Court had proved unacceptable and the respective school boards had the duty to formulate new and nondiscriminatory plans.

On June 11, 1968, the plaintiffs moved that the District be required to submit still another plan. *Green* was cited in support of that motion. The District filed its response. Interrogatories were submitted. On August 15 the district court ordered the District to file further modifications or an alternative by November 1.

On October 9 the District filed its report setting forth, as of September 30, 1968, the number of students in each grade in each school and the number of minority students in each grade. On November 1 a proposed modification of the plan was filed. This recited that the District had operated under a freedom of choice procedure "which has been most effective"; that the number of black children "at-tending formerly white schools has almost doubled each year"; that zoning in the District "would result in substantially less progress" and "would, in fact, be moving away from a unitary non-racial system" and therefore was not feasible for the District; that, effective in September 1969, 12 elementary schools, three junior high schools, and one senior high school were proposed; that in order to accomplish this the board would submit to the voters of the District, at the March 1969 election, a tax proposal whereby adequate funds might be obtained for necessary modifications and additions to effectuate the plan; that the junior high school "affords the greatest opportunities for innovation" in curriculum and other areas, and, with three such schools, "the opportunity for adaptability is unlimited"; that each junior high "will identify the individual characteristics which it will emphasize"; and that, with these modifications, freedom of choice "will be continued as the most effective available means to provide good education for all students and, at the same time, create a unitary non-racial system."

The plaintiffs objected to the modified plan on the grounds that it would retain racial identification below the high school level; that the District had not demonstrated that alternatives to freedom of choice were less feasible for unifying the system; and that faculty desegregation would not be completed by September 1969.

The proposal submitted to the electorate on March 11, 1969, was defeated.

Chief Judge Harris brought the matter on for hearing on April 1, 1969. At the conclusion of the hearing he orally expressed concern "about the apparent backward step that the El Dorado School District obviously feels, from this record, compelled to undertake," and observed that unless someone else "has something to offer", then "the Court is going to offer something himself." He then issued his written order denying the District's proposal to continue its freedom of choice plan as so modified. He also ordered

that the District submit another plan and that a hearing thereon would be conducted on April 9.

On April 7 the District filed its further revised plan. This in general provided (1) freedom of choice exercisable annually for all elementary school students; (2) two junior high schools, both formerly all white, for 1969–70; (3) freedom of choice for all junior high school students for that year; (4) the assignment of all 11th and 12th grade students to the formerly white high school, thereafter to be known as the "West Campus" ; (5) the assignment of all students in grade 10 to the formerly black junior-senior high school. thereafter to be known as the "East Campus" ; (6) the use of several portable classrooms at the junior high level; (7) "extensive faculty changes" to be made "without regard to race" but as to which the District requested time for implementation subject to the continuing supervision of the court; (8) the filling of faculty vacancies "with the minority race in a particular school whenever possible" ; (9) all "transportation services will be furnished, sponsored and utilized without regard to race * * *."; and (10) all attendance zones "have been abolished" and the District "will continue to take all reasonable steps to operate the school system without regard to race * * * and to eliminate all vestiges of a dual system of schools."

At the April 9 hearing the plaintiffs produced a witness, presented as an expert, who proposed three alternatives to freedom of choice, namely, "fluid attendance zones"; a combination of pairing, pooling, and zoning; or placing black pupils in the excess capacities in the white schools (a plan he did not favor). His qualifications and his proposed alternatives were challenged by the District. Against this was the testimony of the superintendent of schools that methods other than freedom of choice had been reviewed and that for this District at the elementary level freedom of choice "offers the only chance of making a de-

segregated school system that will stay desegregated"; yet he did not feel "that freedom of choice will cause white youngsters to go into black schools" immediately.

When the hearing was concluded Judge Harris said that he was prepared to rule. He orally stated, first, that he would retain jurisdiction. He stated, next, that it was "most unfortunate that we cannot have a better cooperation insofar as the meeting of the minds is concerned of a problem so deeply affecting the community and the life of the community." He then went on to say,

"I suspect that I have had association with the public generally about as much as anyone who lives in this particular time in this area. I think I know something about the pulse of the people and how they feel and how they react. * * * This school board has done a magnificent job with a very difficult problem.

"Even though there are some who feel that no progress has been made, there are some who feel that too much progress has been made * * *.

" * * * I have already said that this school board has indicated its good faith, and I think that the unacceptable proposal that came in on the first day of April, just about a week ago, was solely the result of the recent election.

" * * * I am constrained to feel, and I so hold in my decision here, that the school board has offered about the most practical solution to the high school situation as of this time to bring about compliance as it could offer with the facts. * * *

* * * * * *

"I was concerned about those students who are capable of advanced educational programs such as accelerated classes. * * * I am convinced that that problem is met.

* * * * * *

"So therefore it makes it necessary that there will be an additional burden on the school board to do something to

accommodate these approximately 500 junior high students. I think under the circumstances, from the testimony that has been presented here today, that the board has made the best decision with the facts as we have before us that I can see that it could make.

\* \* \* \* \* \*

"With those [elementary] schools being little affected as has been indicated by this testimony, and I am sure there are others, I believe that with the proper understanding and the report which I am going to require the school board to give me after this next school year \* \* \* I believe that the spirit and the letter of the law the Supreme Court has laid down from the *Green* [v. *New*] *Kent County* case \* \* \* we are moving on toward not only compliance but hopefully an understanding of the problem. I know that I am taking a chance, and probably by the next school year we will have a direction from the Circuit Court of Appeals."

On April 17 the court issued its formal order approving the plan which the District had filed on April 7. This approval was subject, however, to further reports and to the continuing jurisdiction and supervision of the court. The plaintiffs' motion for allowance of attorney's fees was denied. The present appeal is from that order.

On September 9, 1969, seven days after school opened for the fall term, the District filed a report setting forth the student and faculty racial composition for each school in the District for 1969–70. At oral argument the parties referred to this report as appropriately before us. We reproduce it in the margin.\* (We note, incidentally, that the report does disclose definite advances from 1968–69; for example, in the earlier year 1,774 black children attended all-black schools in the District, but for 1969–70 this is reduced to 645).

Having in mind Judge Lay's positive observation, made in Kemp II, that now "the only permissible program is one that

---

\* "COMES El Dorado School District No. 15, by W. D. Toomey, Superintendent, and states to the Court that the following is the student and faculty composition of the schools of this District for the school year 1969–70:

| School | Total Students | Negro | Total Teachers | Negro |
|---|---|---|---|---|
| El Dorado High School West Campus | 908 | 186 | 59 | 13 |
| El Dorado High School East Campus | 589 | 142 | 26 | 7 |
| Barton Junior High | 829 | 251 | 47 | 10 |
| Rogers Junior High | 889 | 316 | 40 | 8 |
| Hugh Goodwin School | 451 | 136 | 20 | 3 |
| Northwest Elementary | 477 | 43 | 19 | 3 |
| Carver Elementary | 98 | 98 | 5 | 3 |
| Murmil Heights | 361 | 7 | 14 | 3 |
| Retta Brown | 335 | 182 | 14 | 3 |
| Fairview School | 308 | 308 | 12 | 9 |
| Rock Island | 68 | 68 | 5 | 3 |
| Southside School | 320 | 149 | 13 | 3 |
| Watson School | 171 | 171 | 7 | 5 |
| West Woods School | 279 | 35 | 13 | 3 |
| Yocum Elementary | 448 | 36 | 21 | 3 |
| TOTAL: | 6,531 | 2,128 | 315 | 79 |

"Morning Star Elementary School received a minimum number of choices to attend that school and due to its small size and the fact that the District was able to accomodate [sic] all students who chose that school into other elementary schools of the District, Morning Star has been closed and the students who chose that school have exercised their choice to choose another elementary school in the District."

works", 389 F.2d 178 at 181, the September 1969 report on its very face is heartening. It reveals that:

1. The two high schools are not racially identifiable. Indeed, they could not be, for all 11th and 12th grade students attend the West Campus and all 10th grade students attend the East Campus.

2. The two junior high schools are not racially identifiable. The ratio of whites to blacks there (76.76% for Barton and 73.775% for Rogers) closely approximates the 75.423% ratio for all students in the District. This was accomplished by freedom of choice in line with the District's hope and expectation and in the face of a most pessimistic prediction on the part of the plaintiffs.

3. The faculty in every school has representatives of both races and the percentages approximate the overall race ratio. We are not persuaded by the suggestion, made by plaintiffs at oral argument, that at Carver, Fairview, Rock Island, and Watson the faculty allocation is still insufficient. The faculty in each of these schools is not numerous and the shift of only one person between the races would effect a substantial variance in percentage.

Indeed, on this appeal, plaintiffs' counsel acknowledged that the high schools and the junior high schools at least give the appearance of desegregation, although some "ancillary problems" remain, and that no issue is made at this time as to the results obtained for the high schools and the junior high schools or with respect to the faculty. We are gratified with what the District has accomplished in these three areas.

We therefore affirm the district court's approval of the District's plan, as made current with the report of September 9, 1969, with respect to faculty and with respect to grades 7 through 12, inclusive.

In passing, we feel compelled to observe that this phase of the present case presents a classic example of the fact that, under the supervision of an able, knowledgeable and conscientious district judge, appropriate results may be achieved by varying methods. See Green v. County School Bd., supra, 391 U.S. 430 at 439, 88 S.Ct. 1689, 20 L.Ed.2d 716; United States v. Montgomery County Bd. of Educ., 395 U.S. 225, 235, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). The high school result was accomplished with pairing and transportation, for the two facilities are some distance apart. The junior high result was accomplished with freedom of choice; these two facilities are within four blocks of each other.

As an inferior federal appellate court, however, we would not be permitted to be content with the District's elementary school situation despite the advances which have been made. Some of these schools appear to be in, or close to, full compliance with existing requirements. But four continue to be racially identifiable and completely black, namely Carver, Rock Island, Fairview, and Watson. All four were constructed in 1959 and all four are located in black neighborhoods. More than half the District's elementary school black children attend these four schools. (The other side of this coin, of course, is the increase in the number of black students attending formerly white elementary schools, namely, 323 in 1968–69 and 588 in 1969–70). At the same time Murmil Heights is a racially identifiable white school. And racial composition of still others may be somewhat suspect. Carver and Rock Island are small schools, one located somewhat to the north of the District's central area, the other far to the south. Fairview and Watson are larger; each is located in the southeast quadrant of the District not far from Murmil Heights. Despite the short distance between the schools, the record reveals that Murmil Heights is separated from Fairview and Watson by a swamp and that a road across that swamp has not been built and perhaps cannot be installed without substantial expense. Counsel for the defendants at oral argument acknowledged that the racial identifiability of these elementary schools could not be

justified, and plaintiffs' expert witness had acknowledged on the stand that "it could very well be that Murmil Heights would have to be left as one of the schools which would be, say, minimally desegregated * * *."

The parties agree that the case is to be remanded, in any event, for the continuing supervision of the district court. We, too, conclude that this is necessary. We make our remand, therefore, with specific approval at this time, as above indicated, of the high school and of the junior high school situations and of the faculty assignments. But we also remand with the direction that the District and the district court, forthwith, and with meaningful deadline dates established, direct their attention to the elementary school situation and, in particular, to Carver, Rock Island, Fairview, Watson, and Murmil Heights. These five facilities must shed their racial identification. At oral argument counsel for the defendants intimated that Carver and Rock Island could possibly be closed and the students in those two schools transferred elsewhere. We do not direct that this specific step or any other specific step be taken to resolve the problem. It is, however, a possibility which merits consideration and it may prove to be the comparatively easy answer for those schools. The Fairview-Watson-Murmil Heights problem may be a much more difficult one but it, too, requires further immediate attention. " '[A]ll deliberate speed' for desegregation is no longer constitutionally permissible" and the District is under an obligation "to operate now and hereafter only unitary schools." Alexander v. Holmes County Bd. of Educ., 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Dowell v. Oklahoma City Pub. Schools Bd. of Educ., 396 U.S. 269, 90 S.Ct. 415, 24 L.Ed.2d 414 (1969); Carter v. West Feliciana Parish School Bd., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed. 2d 477 (1970); Jackson v. Marvell School Dist., 416 F.2d 380 (8 Cir. 1969); United States v. Lovett, 416 F.2d 386 (8 Cir. 1969).

We carefully delineate what this panel does not decide by this opinion:

1. We do not rule that the neighborhood school concept is constitutionally permissible or is constitutionally impermissible.

2. We do not rule that busing is a constitutional imperative. Busing is only one possible tool in the implementation of unitary schools. Busing may or may not be a useful factor in the required and forthcoming solution of the elementary school problem which the District faces. It may or may not be feasible to use it, in whole or in part, for Fairview-Watson-Murmil Heights and it may or may not be feasible to use it, in whole or in part, elsewhere in the system. Busing is not an untried or new device for this District. It has been used in the past and it is being used to an extent at the present.

3. We do not rule that precise racial percentages across the District at the respective elementary, junior high, and high school levels are as yet constitutionally required. Evidently, when precise percentages are achieved, suspicion does tend to vanish. But we are not yet prepared for the sacrifice of other values at the altar of uniform percentages. The plaintiffs in this case express some comfort in what the percentages for September 1969 reveal and we have hereinabove given emphasis to them as a factor—but only as one factor—in the measure of accomplishment. We certainly can conceive of a fully desegregated system where percentages do vary from school to school and where even one school might have a black majority and another a white majority but still, when all factors are fairly and unemotionally considered, the system is "unitized" within the Supreme Court's *Alexander* requirement. That happy day may not yet be upon us and until it arrives percentages may be more significant than they eventually deserve to be. Percentages, in any event, will likely vary from year to year and this in part may be attributable to such things as curricula, special classes, vocational

offerings, and the like, and not entirely to residential patterns. Probably the ultimate answer rests with the last named factor.

We do not read *Alexander* as demanding strict percentages. *Alexander* lays stress upon "unitary schools" and upon the elimination of any "dual school system based on race." Its emphasis is on the system "within which no person is to be effectively excluded from any school because of race or color." 396 U.S. at 20, 90 S.Ct. at 30. What appears to be important are the words "effectively excluded."

4. We do not as yet rule or go so far as to say, as plaintiffs' counsel suggested at oral argument, that dual attendance zones may be constitutionally necessary in order to bring about a unitary system. This, at first glance, is an old and familar argument used in reverse.

5. We do not rule that freedom of choice is not a permissible tool for achieving a unitized system. It obviously has fulfilled its promise at El Dorado on the junior high level. It may or may not continue to work there. It may or may not be promising for other levels or work at those levels. Freedom of choice was not outlawed in *Green* and its companion cases. It was regarded, in line with our own Kemp II, as neither a "sacred talisman" or "an end in itself" and "there may well be instances in which it can serve as an effective device". 391 U.S. at 440, 88 S.Ct. at 1696. On the other hand, the District's concession at oral argument that in the foreseeable future freedom of choice would place no whites in the Watson school is an indicator which the District may not ignore.

The District has come a long way and it has done so, apparently, with little sign of any resegregation tendency. It has a short distance yet to go. We have confidence that the distance which remains will be immediately and successfully traversed.

The case is remanded with directions that the District take the remaining steps called for by this opinion and elimi-nate the last vestiges of racial identification. See Nesbit v. Statesville City Bd. of Educ., 418 F.2d 1040 (4 Cir. 1969).

Costs are allowed to the plaintiffs. We leave the question of allowance of counsel fees, if any are to be allowed, to the discretion of the district court.