Delores CLARK et al., Appellants,

v.

The BOARD OF EDUCATION OF the LITTLE ROCK SCHOOL DISTRICT et al., Appellees.

Delores CLARK et al., Appellees,

v.

The BOARD OF EDUCATION OF the LITTLE ROCK SCHOOL DISTRICT et al., Appellants.

Nos. 19795, 19810.

United States Court of Appeals, Eighth Circuit.

May 13, 1970.

Norman J. Chachkin, New York City, and John W. Walker, Little Rock, Ark., for Clark, and others; Jack Greenberg

and James M. Nabrit, III, New York City, and Burl C. Rotenberry, Little Rock, Ark., on the briefs.

Robert V. Light and Herschel H. Friday, Little Rock, Ark., for Board of Education of the Little Rock School Dist., and others; G. Ross Smith, Little Rock, Ark., on the brief.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES, BLACKMUN, GIBSON, LAY, HEANEY and BRIGHT, Circuit Judges, En Banc.[*]

MATTHES, Circuit Judge.

This appeal and cross-appeal from the judgment of the United States District Court for the Eastern District of Arkansas (the late and lamented Gordon E. Young), causes us again to consider whether the efforts of the Board of Education of the Little Rock, Arkansas, School District (hereinafter referred to as District or Board) to desegregate its schools satisfy the Equal Protection Clause of the Fourteenth Amendment as interpreted in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I) and subsequent decisions of the Supreme Court which have delineated the principles enunciated therein.

The process of desegregation in this District has been controversial and its long history is recorded in the decisions cited in the margin.[1] While we focus our attention on the events from 1966 to the present, it is necessary to briefly sketch the background against which these events are set. Up until 1954 and *Brown I*, the District, pursuant to state law, operated separate educational facilities for black and white children. After much turmoil, and the passage of several years, students were assigned to schools according to the dictates of the Arkansas pupil placement statute. When this practice was found to contravene the Fourteenth Amendment,[2] a "freedom of choice" plan was adopted. In Clark v. Board of Education, 369 F.2d 661 (1966), we sanctioned "freedom of choice" in principle but found the District's plan to be deficient in failing to provide adequate notice to the students and their parents and to provide a definite plan of staff desegregation. We remanded and directed the district court to retain jurisdiction to insure adoption and operation of a constitutional plan for the full desegregation of the Little Rock schools.

In August of 1966, four months prior to our decision in Clark, the Board apparently recognizing the inadequacy of its existing mode of desegregation, employed a team of experts from the University of Oregon to make a study of the system and prepare a master plan of desegregation. The team submitted its recommendations, the "Oregon Report," in early 1967. In brief, the recommendations called for abandonment of the neighborhood school concept and the development of an educational park system [3] through

[*] Judge Mehaffy took no part in the consideration or decision of these appeals.

1. Aaron v. Cooper, 143 F.Supp. 855 (E.D. Ark.1956), aff'd 243 F.2d 361 (8th Cir. 1957) ; Aaron v. Cooper, 2 Race Rel.L. Rep. 934–36, 938–41 (E.D.Ark.1957), aff'd Thomason v. Cooper, 254 F.2d 808 (8th Cir. 1958) ; Aaron v. Cooper, 156 F. Supp. 220 (E.D.Ark.1957), aff'd sub nom, Faubus v. United States, 254 F.2d 797 (8th Cir. 1958) ; Aaron v. Cooper, 163 F.Supp. 13 (E.D.Ark.), rev'd 257 F.2d 33 (8th Cir.), aff'd sub nom. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L. Ed.2d 5 (1958) ; Aaron v. Cooper, 261 F.2d 97 (8th Cir. 1958) ; Aaron v. Cooper, 169 F.Supp. 325 (E.D.Ark.1959) ; Aaron v. McKinley, 173 F.Supp. 944 (E. D.Ark.1959), aff'd sub nom. Faubus v. Aaron, 361 U.S. 197, 80 S.Ct. 291, 4 L. Ed.2d 237 (1959) ; Aaron v. Tucker, 186 F.Supp. 913 (E.D.Ark.1960), rev'd Norwood v. Tucker, 287 F.2d 798 (8th Cir. 1961) ; Clark v. Board of Education of Little Rock, 369 F.2d 661 (8th Cir. 1966).

2. Norwood v. Tucker, 287 F.2d 798 (8th Cir. 1961).

3. The educational park concept, as applied to the Little Rock District, called for a single attendance zone coextensive with the school district boundaries. One high school was to be established drawing students from the entire District. Similarly, fewer middle schools and elementary

the institution of a capital building program and the pairing of schools. The cost of implementing the Oregon plan was estimated to be in excess of ten million dollars. In the November 1967 school board election at least one of the incumbent members of the Board who supported the "Oregon Report" was defeated and replaced by a candidate who opposed the report. The election results were interpreted as a public rejection of the "Oregon Report," and it was subsequently abandoned by the Board.

Still searching for a solution, the Board directed Floyd W. Parsons, Superintendent of Schools, and his staff to prepare a comprehensive plan for desegregation of the schools. Acting accordingly, this group submitted a proposal known as the "Parsons Plan." The plan provided for desegregation of the high schools and two groups of grade schools. It made no provision for the junior high schools. The high schools were to be desegregated by "strip-zoning" the District geographically, generally from east to west so as to form three attendance zones for the high school students. The Horace Mann High School, an all Negro school, was to be abolished and utilized as an elementary facility, and additions were to be made to two of the three remaining high schools. The two groups of elementary schools were to be desegregated by pairing of schools within each group.[4]

The cost of implementing the "Parsons Plan" was estimated at five million dol-lars,[5] and a bond issue for that amount was submitted to the voters in March of 1968. Despite active campaigning by Superintendent Parsons and several Board members, the bond issue was decisively defeated, as were two incumbent members of the Board who supported the plan. Thus, as of March, 1968, the District, although recognizing the inadequacies of the existing means of desegregation, had been unable to develop and implement an acceptable alternative. And, students were assigned for the 1968–69 school year according to "freedom-of-choice."

On June 25, 1968, plaintiffs moved the district court for further relief.[6] The court responded by setting a hearing for August 15, 1968, and, by letter of July 18, 1968, suggested to the Board that it devise a geographic zoning plan to correct student segregation. The Board was also admonished to devise a plan for faculty desegregation so that the racial division of the faculty in each school would approximate the racial breakdown of the faculty in the entire District. At the August 15th hearing the District presented an "interim" zoning plan which was admittedly incomplete and required more study, and requested that the "freedom of choice" method of pupil placement be retained for the 1968–69 school year. After the second day of testimony, the hearing was recessed to enable the District to formulate a final plan for the disestablishment of racial segregation to

schools would be operated, and those operated would be concentrated near the center of the District. Some pairing was contemplated at the elementary level. Obviously, implementation of such a plan would necessitate transportation of some students from their homes to the schools.

4. The "Parsons Plan" called for the creation of two floating zones—the Alpha Complex in the northeastern corner of the District and the Beta Complex in the south central portion of the District. Within these two complexes there existed a number of elementary schools, some of which were predominantly black and others predominantly white. Under Mr. Parsons' plan these elementary schools

would be paired in order to achieve a "reasonable racial ratio" in each of the schools. Some remodeling of existing facilities was contemplated in implementing the two complexes.

5. However, less than 40% of this sum was directly related to achieving desegregation. The remaining 60% of the cost arose from needs of the system apart from efforts to desegregate.

6. Several parties sought to intervene. A group of Negro children, by their parents, were permitted to intervene as parties plaintiff. The Little Rock Classroom Teachers Association was also permitted to intervene.

become effective at the beginning of the 1969–70 school year. Before recessing, the court reaffirmed its earlier suggestion concerning faculty desegregation and stated unequivocally that "freedom of choice" as applied to the Little Rock schools would not satisfy the constitutional requirements. The Board was directed to file its plan not later than November 15, 1968.

During the Board's deliberations two plans were submitted for its consideration and rejected. A group of Negro citizens offered the "Walker Plan," so designated because John Walker, counsel for plaintiffs, was a moving force in its formulation. The "Walker Plan" contemplated grade restructuring and pairing of schools throughout the District and at all grade levels. Substantial transportation of students would have been necessary to implement the plan. The Board also considered and rejected a proposal offered by two of its members calling for retention of "freedom of choice" plus the reservation of space at predominantly white schools for Negro children desiring to attend them. The Board finally adopted, with two members dissenting, a plan for pupil assignment based on geographic attendance zones.

Appended to this opinion is a reduced reproduction of defendants' Exhibit 22 depicting the geographic zones proposed, and designating the location of elementary, junior high and high school buildings. The elementary zones are defined by fine lines and the junior high zones by broad lines. On the original exhibit the high school zones are identified by four different colors. Because we were unable to reproduce the colors, we have highlighted the high school zone boundaries by a crossed line, and have appropriately designated the several colors of the original exhibit. Except for this alteration, the map is an exact reproduction of the original exhibit.

As illustrated by the map, the Little Rock School District is an irregular rectangle running from east to west. Natural boundaries on the north and south and the commercial and industrial nature of the eastern portion have caused the city to expand toward the west. Generally speaking the eastern one-half of the District is inhabited predominantly by Negro citizens and the western one-half predominantly by white citizens.

At the beginning of the 1969–70 school year there were 24,248 students in the system; 15,027 white and 9,221 Negro. They attended five high schools, seven junior high schools, and thirty-one elementary schools throughout the District.

Under the District's plan, all students were to attend schools serving their grade level in their zone of residence except: (1) students attending Metropolitan High School,[7] (2) students in the 8th, 10th and 11th grades in 1969–70, who were permitted to choose between the school in their zone and the school the had previously attended [8] and (3) children of teachers in the District, who could attend the school where their parents were employed. The proposal for faculty desegregation complied with the suggestion of Judge Young. It called for the assignment of teachers so that the percentage of Negro teachers in each school ranged from a maximum of 45% to a minimum of 15%.

Pursuant to the court's direction at the conclusion of the August 16 hearing, the District submitted the plan now under consideration. On December 19, the hearing was resumed and additional evidence was introduced. On May 16, 1969, the district court filed its unreported opinion. While approving the District's plan in principle, the court amended it by: (1) redrawing the Hall High School zone to include approximately 80 additional Negro children; (2) establishing

---

7. Metropolitan High School is a vocational school which serves the entire District. No segregation exists as to this facility.

8. This departure from geographical attendance zones was an effort to minimize disturbance of the extra-curricular patterns established by students in these grades.

a "Beta Complex"; [9] (3) providing for majority to minority transfer of students.[10]

Both parties have appealed from the district court's judgment.

A brief summary of the contentions urged upon us will suffice. Plaintiffs submit that the geographical zones as drawn merely serve to perpetuate the previously established segregated attendance patterns of the students in the District. Neither the neighborhood school concept nor the possible necessity of busing, according to plaintiffs, excuses the District's failure to achieve a unitary system devoid of racially identifiable schools. Lastly, they argue that the faculty assignment approved by the district court continues to preserve the racial identity of certain schools.[11]

Conversely, the District is of the firm conviction that the plan that it submitted to the district court is constitutionally faultless. It reasons that the geographical zones were drawn without regard to race, and that, as such, the plan established a unitary system within the constitutional requirements. It is further asserted that the constitution does not require transportation of children outside the area of their residence in order to achieve racial balance in the schools, and indeed the assignment of pupils according to race would itself be a violation of the Fourteenth Amendment. According to the District, the neighborhood school concept is educationally sound, and, in view of community attitudes, the only feasible means of operating the Little Rock system.

On cross-appeal the District objects to the district court's departure from the geographical zoning scheme it submitted.

It is argued that the gerrymandering of the Hall zone to include more Negro students and the majority to minority transfer provision are violative of the Fourteenth Amendment since they require racial distinctions to be made. A similar objection is made to the "Beta Complex."

### THE FACULTY

For the 1969–70 school year there were 1053 teachers employed by the District— 29% Negro and 71% white. Under the plan adopted by the District and approved by the district court, the percentage of Negro teachers in each of the schools varies from 14% to 50%.[12] Plaintiffs complain that even under the approved plan there is a general pattern throughout the system whereby schools with a high proportion of Negro students ("Negro schools") have a higher percentage of Negro teachers. They argue that this pattern tends to reinforce the racial identity of those schools.

■■ Just as schools may be racially identified by the makeup of their student body, so may they be identified by the character of their faculty, and school boards are obligated to correct any previous patterns of discrminatory teacher assignment. One means of correcting such patterns is to assign teachers so that the ratio of Negro teachers to white teachers in each school approximates the ratio for the District as a whole. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed. 2d 263 (1969); Yarbrough v. Hulbert— West Memphis School District, 380 F.2d 962 (8th Cir. 1967). However, the ultimate goal is the assignment of teachers solely on the basis of educationally sig-

9. The court adopted in part Mr. Parsons' concept calling for the pairing of certain elementary schools within a floating zone. *See* note 4 *supra*.

10. This provision of the court's modification permitted students attending schools in which their race was in the majority to transfer to schools in which their race was in the minority, subject to the availability of space in the transferee school.

11. Plaintiffs also assert that the district court erred in refusing to allow them attorney fees.

12. The district court judge, on the basis of projected figures, thought the percentages would range from 15% to 45%. Because of resignations, attrition, etc. these figures proved slightly incorrect.

nificant factors, wherein race in and of itself is irrelevant.

■ The plan adopted by the District provides for the nondiscriminatory assignment of teachers and affirmative steps to correct the existing imbalance. The experts agreed that the District's plan was ambitious, and in fact some doubt was expressed as to whether it could be carried out. However, to a remarkable degree it has been implemented, and its implementation has radically changed the complexion of faculties throughout the district. Where before Negro teachers were heavily concentrated in those schools long identified as Negro, they are now distributed throughout the District so that no school has more than 50% Negro teachers. Indeed, and particularly at the elementary level, in most of the schools the percentage of Negro teachers in any particlular facility varies only slightly from the percentage of Negro teachers in the District as a whole.

Therefore, we affirm the district court's approval of the District's plan with respect to faculty.[13] See Kemp v. Beasley, 423 F.2d 851 (8th Cir. 1970) (*Kemp III*). The plan as implemented has corrected the exaggerated racial imbalance of teachers in the system. Faculty desegregation through teacher assignment is a dynamic process. The District has committed itself to the non-discriminatory assignment of teachers and the correction of previous segregation, and has for the 1969–70 school year evidenced its good faith in fulfilling these commitments. We are confident that any remaining vestiges of faculty segregation will be corrected by the District's continuing efforts.

## STUDENTS

■ After deliberate consideration, we are driven to the conclusion that the proposal for student desegregation does not comport with the recent pronouncements of the Supreme Court, hence it must be rejected. We hasten to add, however, that significant progress has been made by the District. For example, Central High School, the scene of so much turmoil in 1957, is now desegregated—1,542 white, 512 Negro. So too are several other previously all-black or all-white schools. However, as we recognized in *Kemp III, supra*, the finding of some progress does not end the inquiry whether the particular District has satisfied its constitutional obligations.

■■ It is, of course, axiomatic that the operation of separate schools for black and white children under sanction of state law is violative of the Fourteenth Amendment. As the Court observed in *Brown I, supra*, in the field of education "separate facilities are inherently unequal." And in *Brown II*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), school districts which had previously operated "separate" schools were ordered to take the necessary action to eradicate this constitutional violation. The question now before us is whether the District has fulfilled its constitutional obligation to convert what admittedly was a segregated school system to a "unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board of New Kent County, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

Principal guidance from the Supreme Court as to this issue is to be found in the trilogy of cases decided in 1968. Green v. County School Board of New Kent County, *supra*; Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners of City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733

---

13. Compare the order of Judge Johnson in Carr v. Montgomery County Board of Education, 289 F.Supp. 647 (M.D.Ala. 1968). In a district where the faculty ratio was 3 to 2, the order required that in the coming school year only 1 of every 6 members of each school's faculty be from the race which was in the minority in that particular faculty. This was approved in United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670 (1969).

(1968). Each of the school districts there involved had adopted "freedom of choice" plans (or modifications thereof) for pupil assignment. In general the "freedom of choice" plans under consideration had not significantly altered attendance patterns which had been established by pre-*Brown I* state segregation laws. "Negro schools" continued to be attended by Negro students and "white schools" by white students. For example, in *Green* 85% of the Negro children continued to attend the all Negro school. Despite the School Board's contention in *Green* that it had "fully discharged its obligation by adopting a plan by which every student, regardless of race, may 'freely' choose the school he will attend," 391 U.S. at 437, 88 S.Ct. at 1693, the Court found that "freedom of choice" as applied to these three districts did not meet the constitutional requirements.

The thrust of all three opinions is that the manner in which desegregation is to be achieved is subordinate to the *effectiveness* of any particular method or methods of achieving it. The following language is instructive:

"The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*.

The obligation of the district courts, as it always has been, is to assess the *effectiveness* of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. * * *

We do not hold that 'freedom of choice' can have no place in such a plan. We do not hold that a 'freedom of-choice' plan might of itself be unconstitutional, although that argument has been urged upon us. Rather all we decide today is that *in desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself*." 391 U.S. at 439–440, 88 S.Ct. at 1694. (emphasis in the second and third paragraphs supplied).

More recent pronouncements by the Court are consistent with this pragmatic approach. In Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), the Court ordered the "immediate" termination of dual school systems and the operation of "unitary school systems within which no person is to be *effectively excluded* from any school because of race or color." Id. at 20, 90 S.Ct. at 30. (emphasis supplied).

Review of desegregation decisions from this circuit reveals that we too have tested proposed plans of desegregation by their effectiveness. For instance, ten years ago we held that the Arkansas pupil placement statute, on its face a non-discriminatory and educationally rational means of pupil placement, could not be used to assign students, if it failed to correct the segregated character of the system. Dove v. Parham, 282 F.2d 256 (8th Cir. 1960).[14] In 1968, prior to the *Green* trilogy, we were faced with a "freedom of choice" plan. Kemp v. Beasley, 389 F.2d 178 (8th Cir. 1968) (*Kemp II*). It too was asserted to be educationally sound and devoid of racial considerations. However, we tested "freedom of choice" as applied in that particular instance and found it lacking; not by viewing it in the abstract, but rather by considering whether it effectively advanced the desegregation process. Our analysis in *Kemp II* was, of course,

14. *See also*, Norwood v. Tucker, 287 F.2d 798 (8th Cir. 1961).

approved by the *Green* trilogy.[15] And, only very recently we again found "freedom of choice" to be constitutionally deficient in *Kemp III, supra*. Although desegregation had been accomplished at the high school level by pairing and the junior high level by "freedom of choice," application of "freedom of choice" to the elementary grades left 5 of the 10 schools racially identifiable. We ordered the District to take the necessary steps to correct the segregated character of those 5 elementary schools.

■ Thus, as of this date, it is not enough that a scheme for the correction of state sanctioned school segregation is non-discriminatory on its face and in theory. It must also prove effective. As the Court observed in *Green*:

"In the context of the state-imposed pattern of long standing, the fact that in 1965 the Board opened the doors of the former 'white' school to Negro children and of the 'Negro' school to white children merely begins, not ends, our inquiry whether the Board has taken steps adequate to abolish its dual, segregated system. Brown II was a call for the dismantling of a well-entrenched dual system." 391 U.S. at 437, 88 S.Ct. at 1694.

■■ We believe that geographic attendance zones, just as the Arkansas pupil placement statutes, "freedom of choice" or any other means of pupil assignment must be tested by this same standard.[16] In certain instances geographic zoning may be a satisfactory means of desegregation. In others it alone may be deficient. Always, however, it must be implemented so as to promote desegregation rather than to reinforce segregation. See United States v. Indianola Municipal Separate School District, 410 F.2d 626 (5th Cir. 1969); Henry v. Clarksdale Municipal Separate School District, 409 F.2d 682 (5th Cir. 1969); United States v. Greenwood Municipal Separate School District, 406 F.2d 1086 (5th Cir.), cert. denied, 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed. 220 (1969).

■ When viewed in context of the above principles, the plan approved by the district court is constitutionally infirm. For a substantial number of Negro children in the District, the assignment method merely serves to perpetuate the attendance patterns which existed under state mandated segregation, the pupil placement statute, and "freedom of choice" [17]—all of which were declared unconstitutional as applied to the District. In short the geographical zones as drawn tend to perpetuate rather than eliminate segregation.[18] Several examples are illustrative. During the 1968–69 school year, under "freedom of choice" Mann High School, located in the eastern portion of Little Rock and historically an all Negro school,

15. Indeed *Kemp II* was cited with approval. 391 U.S. at 440, 88 S.Ct. 1689.

16. The Board's reliance on language in *Green* for the proposition that geographic zoning in and of itself is constitutionally mandated is misplaced. In two places in the *Green* opinion the Court did refer to geographic zoning as a *possible* alternative to "freedom of choice." However, it is clear when considered in context, that the Court was limiting its suggestion to the Kent district, a district without residential segregation. Indeed footnote 6 quotes with approval a paragraph from the concurring opinion in Bowman v. County School Board, 382 F.2d 326 (4th Cir. 1967), in which it is stated, " * * * a geographical formula is not universally appropriate." Id. at 332. Any other reading of the *Green* decision would be entirely inconsistent with the Court's declaration that the ultimate test is effectiveness and many plans may or may not prove effective in a particular instance. *See also* the footnote appearing at 391 U.S. 460, 88 S.Ct. 1689.

17. Under "freedom of choice" in 1968–69 approximately 75% of the Negro students attended schools in which their race constituted 90% or more of the student body. The plan adopted by the district court reduces this percentage by only 6%.

18. It was agreed by all the experts that zone lines for the District would have to be drawn from east to west if previously established attendance patterns were to be broken.

was attended by all Negroes. In this school year it is attended by 838 Negroes and 4 whites. Parkview High and Hall High, historically white schools,[19] have 45 Negro and 793 white and 40 Negro and 1,415 white students, respectively. Prior to this year both Booker Junior High [20] and Dunbar Junior High [21] were all Negro. Now they are attended by 733 Negro and 20 white and 685 Negro and 18 white students, respectively. Two junior high schools located in the western portion of the city are attended by similar proportions of students with white students predominating. At the elementary level, Carver, Gillam, Granite Mountain, Ish, Pfeifer, Rightsell, Stephens, and Washington all have 95% or more Negro students.[22] In a number of other elementary schools the reverse is true. All of the foregoing schools are racially identifiable.

While it is true that the majority to minority transfer provision has the potential for alleviating the situation to an extent, it is in large part an illusory remedy. No transportation is provided for those children choosing to take advantage of it. And, it requires little insight to recognize that the children who are most likely to desire transfer are those least able to afford their own transportation. Moreover, there is no assurance that space will be available in the schools to which most of the transfers would probably occur.[23]

Alternative means of pupil assignment which would provide more effective desegregation were and are available to the District. Indeed, several such means were embodied in plans submitted to and considered by the Board. We point this out not as an endorsement of any particular plan, but merely to emphasize that alternatives are available. Of particular significance is the "Parsons Plan," which was developed by a group of educators closely affiliated with the District and presumably quite sensitive to the educational needs and problems of the community. It was long ranged and comprehensive. If implemented, it would have cured the isolation of Mann High School as a Negro facility. The "Parsons Plan" also would have erased the racial identity of several elementary schools which exists under the plan now before us. It enjoyed the support of the Board and the professional staff of the system.

 Because of community opposition to the plan, as manifested in the defeat of a millage increase necessary to finance its implementation, the "Parsons Plan" was not adopted. Similarly, community opposition was a substantial factor in rejection of other promising plans. We are not unmindful of the difficult nature of the Board's duties in this District.[24] However, it has long been the law of the land that community opposition to the process of desegregation cannot serve to prevent vindication of constitutional rights. Monroe v. Board of Commissioners of the City of Jackson, *supra*; Aaron v. Cooper, 358 U.S. 1, 78 S.Ct. 1401 (1958); Jackson v. Marvell School District No. 22, 416 F.2d 380 (8th Cir. 1969). Accordingly, we are not at this time prepared to hold that the

19. Both of these schools were constructed after 1956.

20. This school, named after a prominent Negro, was constructed in 1963. Only Negro children were assigned to it, and it was staffed by Negro teachers.

21. Prior to 1954, Dunbar was the Negro junior high school for the District.

22. Carver, Granite Mountain, Pfeifer, and Washington were operated as "Negro schools" under state-imposed segregation. Rightsell was converted to a "Negro school" in 1961. Gillam and Ish, named after prominent Negroes and located in Negro neighborhoods, were constructed in 1963 and 1965, respectively. They were staffed by Negroes and have always been attended almost solely by Negro students.

23. Compare the transfer provision adopted in Ellis v. Board of Public Instruction of Orange County, 423 F.2d 203 (5th Cir. Feb. 17, 1970), which provided transportation for children choosing to transfer and insured that space would be available in the transferee schools.

24. Aaron v. Cooper, 257 F.2d 33, 39 (1958).

geographical zoning plan adopted by the lower court is the only "feasible" means of assigning pupils to facilities in the Little Rock School System. Green v. County Board of Education of New Kent County, 391 U.S. at 439, 88 S.Ct. 1689.

## CROSS-APPEAL

By way of cross-appeal defendants challenge those provisions of the district court's order departing from the geographical zoning plan submitted by the Board. Since we have found the plan adopted by the district court to be deficient in the aforementioned particulars thereby requiring remand for adoption of an entirely new plan, defendants' objections become somewhat academic. Nevertheless, we briefly address ourselves to the contention that any consideration of race in the placement of pupils is a violation of the Fourteenth Amendment.

 This argument is not new and has been previously heard and rejected by this court. Kemp II, 389 F.2d at 187–188. See also United States v. Jefferson County Board of Education, 372 F.2d 836, 876–878 (5th Cir. 1966); Wanner v. County School Board, 357 F.2d 452, 454–455 (4th Cir. 1966); Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564, 577–578 (1965). As the *Wanner* court observed it would be somewhat anomolous to prevent correction of previous segregation under the guise that the remedy impermissibly classifies by race. Accordingly, we are not persuaded by defendants' contention that the Fourteenth Amendment prohibits the drawing of geographic zones to promote desegregation, the majority to minority transfer plan, or any other consideration of race for the purpose of correcting unconstitutionally imposed segregated education.

## REMEDY

 This court has long recognized that it should not endeavor to devise a plan of desegregation for any school district. *Kemp III, supra*; Yarbrough v. Hulbert—West Memphis School District, *supra*; Clark v. Board of Education of Little Rock, *supra*; Kemp v. Beasley, 352 F.2d 14 (8th Cir. 1965); Aaron v. Cooper, 257 F.2d 33 (8th Cir. 1958). This task is basically within the province of the school board under the supervision of the district court. We continue to adhere to this philosophy. In light of the size and complexity of the Little Rock School District it is additionally important that the Board be afforded ample opportunity to formulate a comprehensive plan of desegregation. Nor do we believe it proper to direct the Board to adopt a particular means of school desegregation. As was observed in Green v. County Board of Education of New Kent County, *supra*, there are a variety of methods of desegregation, and no particular method is universally appropriate. Considering the unique problems facing the District any one of several different methods, or a combination thereof, may be deemed appropriate. We leave this decision to the school board and the sound discretion of the district court. We do, however, strongly suggest that the Board consider enlisting the services of the Department of Health, Education and Welfare in developing an acceptable scheme of desegregation.

Consistent with these above views we consider several questions either implicitly or explicitly raised in the parties' briefs and oral arguments.

 As in *Kemp III, supra*, we do not hold that precise racial balance must be achieved in each of the several schools in the District in order for there to be a "unitary system" within the meaning of the constitution. Nor do we hold that geographical zoning or the neighborhood school concept are in and of themselves either constitutionally required or forbidden. See *Kemp III*. We merely hold that as employed in the plan now before us they do not satisfy the constitutional obligations of the District. By so holding we express no opinion as

to the relative merits or demerits of the neighborhood school.

▮ Lastly, we do not rule that busing is either required or forbidden. As Judge Blackmun stated in *Kemp III*, "Busing is only one possible tool in the implementation of unitary schools. Busing may or may not be a useful factor in the required and forthcoming solution of the * * * problem which the District faces." 423 F.2d 857. We observe in passing, however, that busing is not an alien practice in the state of Arkansas or this District. Some busing was employed by the District in the past to preserve segregated schools. Presently the District, through the use of federal funds, aids some children in eastern Little Rock who use public transportation to travel to schools, and some private busing occurs in the western portion of the city. Of course, busing of school children is a common practice in many less urban areas of the state and is partially subsidized with state funds.

The case is remanded to the district court with directions to require the school district to file in the district court on or before a date designated by it a plan consistent with this opinion for the operation of the system "within which no person is to be effectively excluded from any school because of race or color." Alexander v. Holmes County Board of Education, 396 U.S. at 20, 90 S.Ct. at 30. The plan shall be fully implemented and become effective no later than the beginning of the 1970–71 school year. The district court shall retain jurisdiction to assure that the plan approved by it is fully executed.

Because of the urgency of formulating and approving an appropriate plan, our mandate shall issue forthwith and will not be stayed pending petitions for rehearing or certiorari.

Costs are allowed to plaintiffs. On remand the question of attorney fees may again be presented to the district court.

VAN OOSTERHOUT, Chief Judge, and GIBSON, Circuit Judge, dissenting in part.

Judge MATTHES' carefully prepared majority opinion fairly sets out the pertinent facts and issues presented by the appeal and cross-appeal in this case. We are in agreement with his determination that the plan should be approved as to the faculty desegregation, and also with his affirmance on the cross-appeal. We likewise agree that the court properly retained jurisdiction of the case.

With reluctance, we find it necessary to dissent from the holding of the majority that the plan for student desegregation should be rejected. The late Judge Young, a very able and conscientious judge, heard this case. He advised the Board that the existing freedom of choice plan, which was being fairly administered, did not meet standards for desegregation set by the Supreme Court and he directed the Board to present a geographical zoning plan. After much study, the Board presented such a plan. An extensive evidentiary hearing was held at which school experts testified on behalf of each of the parties. The cause was well tried by able counsel for all parties. In due course, Judge Young filed a well-considered opinion setting forth the law, the evidence and his conclusions. Included in his findings of fact is the following:

"As shown by Defendants' Exhibit 22, the Board's plan for geographical attendance zones, assuming the legality of the neighborhood school concept, seems fairly and equitably drawn. There is no indication of gerrymandering."

Such finding is not contested by plaintiffs. It is supported by substantial evidence and is not clearly erroneous.

Judge Young modified the plan in the manner set forth in the majority opinion. The principal effect of the modification was to impose upon the geographical zoning a freedom of choice option which would allow any student whose race was in the majority in any school to transfer to a school where his race was in the minority. As stated by Judge Young, this modification would permit Negro

students who would otherwise be locked into predominantly Negro schools to transfer to predominantly white schools. Other modifications made, which Judge Young conceded were gerrymandering, were designed to further racial balance in the schools. The Board's plan as modified was approved. The court in its decree retained jurisdiction over the case and required the Board to report further upon the operation of the plan.

For the reasons assigned by Judge Young in his well-considered opinion, we believe the modified plan as approved meets constitutional standards. Everything has been done that could be done short of abandonment of the neighborhood school system to eliminate segregation. Plaintiffs have pointed to no existing state law that prevents desegregation or integration and we find no such law. It can no longer be fairly said that the desegregation process is impeded by state law.

Geographic attendance zones fairly laid out without racial discrimination by a unitary system should meet the constitutional standards set forth in *Brown I* and subsequent Supreme Court cases commanding a racially nondiscriminatory school system. There is no question here of dual attendance zones or of a state imposed pattern of segregation.

The neighborhood school concept, as shown by expert testimony in the record, is a well-established and acceptable means of providing a proper educational program in all sections of the country for people of all nationalities and races. President Nixon in a recent public statement has said neighborhood schools "will be deemed the most appropriate base" for an acceptable school system, and

"transportation of pupils beyond normal geographical school zones for the purpose of achieving racial balance will not be required." [1]

The basic issue presented on this appeal appears to be whether upon the facts disclosed by the record a fairly established geographical zoning system for neighborhood schools must be abolished in order to attain racial balance and if so, whether such balance in each school must closely approach the percentage of each race in the district.

It would appear from the record before us that such racial balance could only be accomplished by pairing white and Negro districts, a considerable distance from each other. On this issue, Judge Young states:

"[T]he plaintiffs attack the neighborhood school principle, saying it has no validity and that the geographic attendance zones should run lengthwise the District. This, as they admit, would involve compulsory transportation of students by bus for distances at least six to eight miles. This is so because the schools in the central part of the City, including Central High, are largely integrated, and the great disparity between the races exists in the extreme eastern and western parts. Therefore, transportation of pupils would consist largely of transportation from the extreme east-to-west and vice versa, traversing the crowded traffic conditions of the middle section, including the downtown district. Thus, high school pupils from Horace Mann in the east would have to be transported past Central to Hall High in the west, or vice versa. The same would be true in a lesser degree with

1. The Gallup poll published in many papers on April 5, 1970, includes the following conclusions:

"By the lopsided margin of eight to one, parents vote in opposition to busing, which has been proposed as a means of achieving racial balance in the nation's classrooms.

"Opposition to busing arises not from racial animosity but from the belief that

children should attend neighborhood schools and that busing would mean higher taxes. This is seen from a comparison of attitudes on busing with those on mixed schools.

\* \* \* \* \*

"When Negro parents are asked the same series of questions, the weight of sentiment is found to be against busing."

the junior high and elementary schools."

The District Courts and the Courts of Appeals are divided upon the constitutional validity of retaining geographical school zones fairly drawn without discrimination. Such issue can only be authoritatively answered by the Supreme Court. While broad language in some of the Court's opinions could arguably be subject to an interpretation that some degree of racial balance is required, it is our view that the Supreme Court has not decided this issue. See Chief Justice Burger's concurring opinion in Northcross v. Board of Education, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (March 9, 1970).

The exhibits in the record reflect that in northern states as well as in the south, the Negro population is frequently concentrated in certain geographical areas and that as a result in many northern metropolitan areas some neighborhood schools serve predominantly only Negro students. Absent state law forcing segregation, as is the situation here, we see no racial discrimination or violation of equal protection. The Constitution should be applied uniformly in all sections of this country.

The approved plan has been in operation only a short time. Particularly in light of the freedom of choice option superimposed upon the geographical zoning, no reliable prediction can be made as to the effect of the plan on desegregation.

Moreover, any resident of a geographical school zone is entitled to attend the school serving his zone regardless of race. Federal law now prohibits racial discrimination in the sale of homes. It is quite possible that acquisition of homes by Negroes in predominantly white zones will promote racial balance in the schools. The approved teacher desegregation plan should also produce more racial balance.

The busing issue is subsidiary to the neighborhood school issue. Busing is of course, frequently provided to transport pupils living at a substantial distance from the schools, particularly in sparsely settled areas. Here a neighborhood school is at hand. Judge Young states that the evidence shows that the annual cost of busing in event of the proposed pairing of districts is $500,000, which apparently is exclusive of required capital expenditure. The busing issue presents the additional problem of whether such a substantial outlay could not be better used for educational purposes.

Absent authoritative guide lines from the Supreme Court as to the constitutional status of neighborhood schools in metropolitan districts, the Board upon remand would be at a loss to know what course to take in devising a desegregation plan. The remand for the proposal and consideration of a new plan for desegregation, absent more specific guide lines, would only create confusion and lack of stability in the Little Rock school system.

We would affirm the order and judgment of the trial court in its entirety.

## APPENDIX