[S.F. No. 22771. In Bank. Jan. 26, 1971.]

SAN FRANCISCO UNIFIED SCHOOL DISTRICT et al., Petitioners, v. DONALD JOHNSON, as Complex Planning Officer, etc., Respondent.

938

## Counsel

Irving R. Breyer, Jerome B. Falk, Jr., and William F. McCabe for Petitioners.

Newman, Robinson & Dunn, Alfred W. Newman, Kronick, Moskowitz, Teidemann & Girard, Adolph Moskowitz, Paul N. Halvonik, Charles C. Marson and Johnson & Stanton as Amici Curiae on behalf of Petitioners.

Richard Harrington for Respondent.

Quentin L. Kopp, Vivian Hannawalt, Willis D. Hannawalt and Ngai Ho Hong as Amici Curiae on behalf of Respondent.

## OPINION

**TOBRINER, J.**—In this action for mandamus we are called upon to determine the interpretation and constitutionality of Education Code section 1009.5, which provides that "no governing board of a school district shall require any student or pupil to be transported for any purpose or for any reason without the written permission of the parent or guardian." We hold that section 1009.5 does no more than prohibit a school district from compelling students, without parental consent, to use means of transportation furnished by the district; so construed, section 1009.5 violates no constitutional mandate. We do not believe the section should be interpreted to prohibit the board from assigning a student to a particular school without parental consent, even if such assignment would involve busing.

▪ We reach these conclusions by application of the principle that a statute which is reasonably susceptible of two constructions should be interpreted so as to render it constitutional. We shall point out that if section 1009.5 were read to limit the school board's authority over pupil assignment it would impinge upon constitutional principles.

More specifically, as we shall later explain in detail, a construction of section 1009.5, prohibiting nonconsensual pupil assignment, first, would involve the parents of school children in that assignment process, a state function, and would fail to foreclose conduct of parents designed to foster racial segregation. This interpretation would render the statute unconstitutional on its face in that, so interpreted, section 1009.5 would create a parental right to discriminate, interposing such a debilitory power upon the board in its effort to achieve integration. Second, the United States Supreme Court has held that school districts which maintain "de jure" segregated systems must eliminate such imbalance and establish unitary systems; yet the realization of that objective may very well require the reassignment of students without parental consent. Third, school boards, administering "de facto" segregated systems may bear an equivalent constitutional duty; in any event, to the extent that the statute involves the state in the preservation of such segregation, the legislation protects the very condition which the Constitution as interpreted by the United States Supreme Court, has condemned.

Nothing we say here should be considered to require the use of district

transportation or busing for purposes of integration or for any other purpose. We are concerned only with the interpretation of a statute. If read in one way, that statute could be construed to *prohibit* nonconsensual busing in order to achieve racial integration; we point out that the section not only does not compel such a construction but also that any such interpretation would encounter constitutional difficulties.

In rejecting the construction that the statute strips a school board of the right to assign pupils to schools not within walking distance of their homes without parental consent, we do not assert that such assignment is in all instances constitutionally compelled. In some situations, however, it is the only practical and efficient method of achieving school integration. ■ An enactment which by flat legislative fiat, prohibits any and all such assignments, exorcising a method that in many circumstances is the sole and exclusive means of eliminating racial segregation in the schools, necessarily legislates the preservation of racial imbalance. It therefore violates constitutional imperatives.

As of September 1969, San Francisco's elementary schools displayed serious racial imbalance.[1] In 1969, 28.7 percent of the children attending elementary school in San Francisco were black. Over 80 percent of the black children in grades one through six attended 27 of the 94 elementary schools. Over 70 percent attended schools in which the black children comprised more than half of the pupils. Ten schools were over 90 percent black; 27.6 percent of the black children attended those 10 schools. Projected population studies indicated that, without remedial action, racial imbalance would increase.[2]

In 1966 the San Francisco School District commissioned the Stanford Research Institute to recommend methods of desegregating city schools.[3] Based on the report of the Institute, the board in 1969 resolved to establish two elementary school "complexes," the Richmond complex and the Park South complex.[4] Each complex consists of a grouping of elementary schools, with some schools assigned to house kindergarten and grades one through

---

[1]See San Francisco Unified School District, Racial Estimates of Pupils Attending San Francisco Public Schools (1969). The figures in the text are computations by this court based upon this report.

[2]See Stanford Research Institute, Population Projection to 1971 (Research Memorandum No. 2 prepared for the San Francisco Unified School District, 1967).

[3]The parties have filed with the court copies of Stanford Research Institute Memoranda Nos. 2, 3, and 4, entitled, respectively, Population Projection to 1971, Dimensions of Equality of Educational Opportunity, and Educational Organization for Desegregation. These memoranda were filed with the board in March and April of 1967.

[4]Resolution 96-10A1, adopted June 10, 1969, and filed as exhibit "c" to the board's petition for mandamus.

three, and others to house grades four through six. A student living within the attendance zone for the complex is assigned to one of the schools in the complex, but in some instances this is not the school which the student previously attended, and not within reasonable walking distance of his residence. The district provides bus transportation, on a voluntary basis, for students living beyond reasonable walking distance of their school. The Richmond complex commenced operation in September of 1970; the Park South complex was tentatively scheduled for January 1971.

Education Code section 1009.5 received the Governor's assent on September 14, 1970 and became effective as of November 23. The proposed Park South complex will not compel any student to ride on a school bus, but it does involve assignment of students to schools under circumstances such that the school bus is the most practical means of transportation. The plan, moreover, does not provide for solicitation of parental consent to pupil assignments; to require such solicitation, and to reassign pupils whose parents withheld such consent, would greatly increase the expense of administration and delay commencement of the complex. If a substantial number of parents of either the white or black races withheld consent, pupil reassignment to conform to parental wishes would defeat the educational objectives of the complex. The legality of the Park South complex thus turns on whether section 1009.5 applies to limit pupil assignments without parental consent and, if so interpreted, is constitutional.

In connection with the Park South complex the board found it necessary to obtain a computer study of the present and proposed school assignments for pupils in the complex. Respondent Donald Johnson, the Complex Planning Officer, was requested to execute a requisition for this study; he refused to do so on the ground that the Park South complex did not contemplate parental consent to pupil assignments and thus was of doubtful legality under section 1009.5. The board thereupon filed the present action in mandamus to compel respondent to execute the requisition for the computer study.

1. *This court has issued an alternative writ of mandamus to review the validity and interpretation of section 1009.5.*

■ This court entertains original jurisdiction in mandamus under California Constitution, article VI, section 10, and Rules of Court, rule 56(a). We exercise such jurisdiction, however, only in cases in which "the issues presented are of great public importance and must be resolved promptly." (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal. Rptr. 609, 428 P.2d 593].) Exemplars of such instances are: *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 90-91 [207 P.2d 47] (qualification of initiative for ballot); *Farley* v. *Healey* (1967) 67 Cal.2d 325, 326-327 [62 Cal. Rptr. 26, 431 P.2d 650] (same); *County of Sacramento* v. *Hickman, supra*

(validity of assessment procedures); *State Board of Equalization* v. *Watson* (1968) 68 Cal.2d 307, 310-311 [66 Cal.Rptr. 377, 437 P.2d 761] (same); and *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765 [87 Cal.Rptr. 839, 471 P.2d 847] (constitutionality of requiring two-thirds majority in bond elections).

Under these precedents, the present case plainly called for the exercise of the original jurisdiction of the court. The issues here presented respecting the interpretation and constitutionality of section 1009.5 are of great public concern and importance; their prompt resolution is essential to orderly planning and pupil assignment not only in San Francisco but throughout the state. The United States Supreme Court has directed that segregation in public schools must terminate "at once." (*Alexander* v. *Board of Education* (1969) 396 U.S. 19, 20 [24 L.Ed.2d 19, 21, 90 S.Ct. 29].) Since section 1009.5, under one interpretation, may delay desegregation, prompt judicial action is essential to comply with this direction. We therefore decided to issue the alternative writ of mandamus requested by petitioners; by so doing "we have necessarily determined that there is no adequate remedy in the ordinary course of law and that [this] case is a proper one for the exercise of our original jurisdiction." (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 773 [87 Cal.Rptr. 839, 471 P.2d 847].)

## 2. *Section 1009.5 is reasonably susceptible of two interpretations.*

The ambiguity of section 1009.5 inheres in the phrase "*require* any student or pupil to be transported."[5] (Italics added.) One may "require" a student to be transported by punishing a refusal or by physically forcing him onto a school bus; in a second sense, one may "require" a student to be transported by *assigning* him to a school beyond walking distance of his home.

The sparse legislative history of section 1009.5 gives no aid in clarifying the section's amorphous proscription. As originally introduced, the legislation provided that "no governing board of a school district shall bus any student for the purpose of integration without the written permission of the parent or guardian."[6] In prohibiting busing for purposes of integration, while allowing busing for all other purposes, the original bill suggested a racial classification probably unconstitutional under *Hunter* v. *Erickson* (1969) 393 U.S. 385, 392-393 [21 L.Ed.2d 616, 622-623, 89 S.Ct. 557].[7]

---

[5] A less significant ambiguity arises from the word "transportation." All parties assume in their argument that section 1009.5 is directed at transportation in buses operated by the school district. Literally, however, "transportation" also encompasses travel by public conveyance or private car.

[6] Assembly Bill No. 551, introduced February 5, 1970.

[7] *Hunter* v. *Erickson* (1969) 393 U.S. 385 [21 L.Ed.2d 616, 89 S.Ct. 557] held unconstitutional an Akron, Ohio, city ordinance which required that all fair housing

Cognizant of this danger the Assembly amended the bill to its present form. The elimination of "shall bus any student" in the original bill and substitution of "shall require any student . . . to be transported" in the present enactment, however, does not relate to the problem of racial classification, and no explanation of the substitution has been offered. Neither the former language nor that of the present enactment, nor any committee reports or statements of legislators resolve the question whether the Legislature intended section 1009.5 to limit the pupil *assignment* authority of school boards.

We turn first to the arguments advanced by respondent in favor of a construction which would apply section 1009.5 to pupil assignments. Respondent contends that the Legislature enacted section 1009.5 for the purpose of granting parents an absolute right to prevent their children from being transported by school bus; the effective protection of this right, he contends, requires a construction of the statute which prevents school boards from assigning students to distant schools since, as a practical matter, the students may be compelled to ride school buses to get to those schools.

■ We agree with respondent that section 1009.5 confers upon the parent the right to reject compulsory busing and, instead, choose to transport his child by some other means more convenient to the parent and child. Respondent, however, assumes a further legislative intent to permit the parent to reject all modes of travel to a school except the walking of a "reasonable walking distance" from the child's home, thus permitting the parent effectively to reject an assignment of his child to a school beyond such distance and, in the absence of a school within such distance, to reject access to the educational system altogether. The meagre legislative history of section 1009.5 does not offer sufficient evidence to support respondent's assumption.

Respondent also calls our attention to the state and national controversy over the reassignment of students from neighborhood schools to more distant schools for purposes of integration. It is this controversy, respondent argues, which impelled the Legislature to enact section 1009.5, and thus, he contends, the section should be construed to express a legislative policy respecting pupil assignment. On the other hand, a requirement that students ride to school in buses instead of by other means of transportation, he urges, is a rare phenomenon unworthy of legislative attention or enactment.[8]

---

ordinances be submitted to popular referendum, but imposed no such condition upon other ordinances.

[8]We know of no instances in which school districts have required students to ride school buses in traveling to schools. The amicus brief of the California Teachers Association, however, states that "many districts often do require pupils to ride a bus to and from athletic events or while on study or field trips."

Many of the statutes dealing with the "busing" controversy, however, expressly and carefully distinguish between "busing" and pupil assignment. Section 209 of the Office of Education Appropriation Act, 1971, prohibits the use of federal funds ". . . to force the busing of students; . . . or to force the transfer or assignment of any student attending an elementary or secondary school so desegregated to or from a particular school over the protest of his or her parents or parent." (P.L. 91-380, tit. II; 9 U.S. Code Cong. & Admin. News, pp. 3319-3320 (1970).)[9] Section 401 of the Civil Rights Act of 1964 refers only to pupil assignment, declaring that "[D]esegregation shall not mean the assignment of students to public schools in order to overcome racial imbalance" (42 U.S.C. § 2000); section 407a of that act refers only to transportation, stating that "nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another. . . ." (42 U.S.C. § 2000c-6.)

The North Carolina law presently before the United States Supreme Court provides that "No student shall be assigned or compelled to attend any school on account of race, creed, color or national origin, or for the purpose of creating a balance or ratio of race, religion or national origins. Involuntary busing of students in contravention of this article is prohibited. . . ." (N.C. Gen. Stat., §§ 115-176.1 (Supp. 1969); held unconstitutional in *Swann* v. *Charlotte-Mecklenburg Board of Education* (W.D.N.C. 1970) 312 F.Supp. 503, cert. granted Oct. 6, 1970.)[10]

We observe, thus, that section 1009.5 was enacted not only in a context of national concern over busing of pupils to integrate schools, but also in a context of both local and national measures which, in dealing with this matter, distinguish between assignment and transportation of pupils. The wording of section 1009.5 is limited to transportation. From this restriction we could infer that the Legislature did not intend to deal with the entire subject of busing and integration, but only with the less controversial subtopic of involuntary busing. Moreover, as we shall discuss in detail later, an extension of section 1009.5 to apply to pupil assignments creates serious problems of constitutionality; the Legislature may well have limited the language of section 1009.5 so as to avoid such difficulties.

In the California Education Code itself the term "transportation" appears frequently. Chapter 1 of division 13 of that code contains a comprehensive

---

[9]Identical language appears in section 409 of the 1968 Appropriations Act. (See P.L. 90-557, tit. IV; 1 U.S. Code Cong. & Admin. News, p. 1147 (1968).)

[10]A similar Alabama law was also held unconstitutional in *Alabama* v. *United States* (S.D.Ala. 1970) 314 F.Supp. 1319.

program, expressed in over 60 statutes, for the provision of school district transportation; article 10 of chapter 3 of division 14 provides for computation of allowances to school districts for transportation. In all these statutes the term "transportation" refers to the actual carriage of persons, or to payments in lieu of carriage. None of the statutes modify or refer to the power of school boards to assign pupils.

We conclude that the context of the enactment of section 1009.5 does at least raise questions as to its meaning, leaving us with disturbing possibilities as to its ambiguous application. We turn, therefore, to the contention of petitioners that unless the section only prohibits the compulsory use of means of transportation, and does not restrict the authority of the board to assign pupils, it runs afoul of the Constitution, both on its face and in application.

3. ■ *Section 1009.5, if construed to require parental consent to the assignment of a pupil to a school beyond a reasonable walking distance from his home, would be unconstitutional.*

The courts have long recognized the principle that if "the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution." (*County of Los Angeles* v. *Legg* (1936) 5 Cal.2d 349, 353 [55 P.2d 206]; *People* v. *Davis* (1968) 68 Cal.2d 481, 483-484 [67 Cal.Rptr. 547, 439 P.2d 651].) Application of that principle to section 1009.5 compels us to interpret that statute to limit its prohibition to the requirement that pupils use means of transportation furnished by the school, and to avoid an extension of its compass to the right of school boards to assign pupils to schools.

The purpose of pupil assignment, obviously, in many cases is to achieve, or at least promote, racial integration in the school district. We shall explain how section 1009.5, if construed to permit parental veto of such pupil assignments, would violate constitutional mandate: first, in that it would impart a private parental decision into the state educational structure and transform that private decision, which could emanate from racial prejudice, into state action; second, in that it would prevent a school board from utilizing an effective principal means of remedying de jure segregation in the schools.

At the outset, we must analyze and reject the preliminary argument of respondent that pupil assignments for the purpose of integrating schools constitute an unconstitutional racial classification and that, accordingly, a

parent, in refusing consent to such assignment, does no more than protect the constitutional right of his child.

a. ■ *The assignment of a pupil to a school beyond reasonable walking distance from his home for the purpose of improving racial balance within the school district does not deny him the equal protection of the laws.*

Our analysis begins with the classic ruling in *Brown* v. *Board of Education* (1954) 347 U.S. 483, 495 [98 L.Ed. 873, 881, 74 S.Ct. 686, 38 A.L.R.2d 1180], that "separate educational facilities are inherently unequal." Evidence accumulated since 1954 has amply confirmed former Chief Justice Warren's declaration. The 1967 report of the United States Commission on Civil Rights, "Racial Isolation in the Public Schools," found that, all other factors being equalized, Negroes in segregated schools have lower educational achievement than Negroes in integrated schools. (Finding 8, p. 204.) The transfer of Negroes to integrated institutions, the commission noted, substantially betters their educational performance without harming the performance of white students. (See pp. 100-109.)

The commission offered the following explanation: "The environment of schools with a substantial majority of Negro students . . . offers serious obstacles to learning. The schools are stigmatized as inferior in the community. The students often doubt their own worth, and their teachers frequently corroborate these doubts. The academic performance of their classmates is usually characterized by continuing difficulty. The children often have doubts about their chances of succeeding in a predominately white society and they typically are in school with other students who have similar doubts. They are in schools which, by virtue of both their racial and social class composition, are isolated from models of success in school." (P. 106.)

The commission went on to note that "racial isolation in the schools . . . fosters attitudes and behavior that perpetuate isolation in other important areas of American life. Negro adults who attend racially isolated schools are more likely to have developed attitudes that alienate them from whites. White adults with similarly isolated backgrounds tend to resist desegregation in many areas—housing, jobs, and schools." (P. 110.)

These findings of the commission do not, of course, turn on whether the segregation is of de facto or de jure character; it is the presence of racial isolation, not its legal underpinnings, that creates unequal education. (See *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876, 881 [31 Cal. Rptr. 606, 382 P.2d 878].) "[S]egregation, regardless of its cause, is a

major factor in producing inferior schools, and unequal educational opportunity." (*Keyes* v. *School District No. 1, Denver, Colorado* (D.Colo. 1970) 313 F.Supp. 61, 82.)

In *Brown* v. *Board of Education* (1954) 347 U.S. 483, 493 [98 L.Ed. 873, 880, 74 S.Ct. 686, 38 A.L.R.2d 1180], the Supreme Court observed that: "Today, education is perhaps the most important function of state and local governments. . . . It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

Unequal education, then, leads to unequal job opportunities, disparate income, and handicapped ability to participate in the social, cultural, and political activity of our society. Integration of the public schools, presenting prospects of raising the level of educational achievement of blacks without harming that of whites, may serve to overcome this inequality of educational opportunity, and to make possible that acquaintance and companionship necessary to break down racial stereotypes and prevent racial prejudice. As stated in *Lee* v. *Nyquist* (W.D.N.Y. 1970) 318 F.Supp. 710, 714, "it is by now well documented and widely recognized by educational authorities that the elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial to all students, both black and white."

It would be ironic, indeed, if the Fourteenth Amendment, adopted to secure equality of citizenship for the Negro, prevented school boards from providing equality of education for the Negro.

Although the Supreme Court has not yet spoken to the issue,[11] the great majority of courts that have ruled upon it have firmly held that pupil

---

[11]In *United States* v. *Montgomery County Board of Education* (1969) 395 U.S. 225, 232-235 [23 L.Ed.2d 263, 270-272, 89 S.Ct. 1670], the Supreme Court approved a ratio plan for desegregation of teachers, without discussing the argument that such plans constitute unconstitutional racial classifications. The Georgia Supreme Court, in *Barresi* v. *Browne* (1970) 226 Ga. 456 [175 S.E.2d 649, 651-652], squarely held that an integration plan which involved pupil reassignment to achieve better racial balance was unconstitutional. The Supreme Court granted certiorari on October 6, 1970, and thus now has the opportunity to decide the validity of this argument.

assignment for the objective of racial integration does not violate the Fourteenth Amendment.[12] ■ As stated by the Fifth Circuit in *United States* v. *Jefferson County Board of Education* (5th Cir. 1966) 372 F.2d 836, 876: "The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetrated and to undo the effects of past discrimination. The criterion is the relevancy of color to a legitimate governmental purpose."

We recognize that racial classifications are constitutionally suspect;[13] in a society free of the perdition of past discrimination, the courts might well reject all attempts at racial classification. We seek, however, to provide for practical remedies for present discrimination, and to eradicate the effects of prior segregation; "at this point, and perhaps for a long time, true nondiscrimination may be attained, paradoxically, only by taking color into consideration." (*Youngblood* v. *Board of Instruction of Bay County, Florida* (5th Cir. 1970) 430 F.2d 625, 630.) ■ We conclude that the racial classification involved in the effective integration of public schools, does not deny, but secures, the equal protection of the laws.

b. ■ *Section 1009.5, if construed to require parental consent to the assignment of a pupil to a school beyond reasonable walking distance from his home, would be unconstitutional on its face in that it endows parents with a veto power over pupil assignments so that parents can inject racial discrimination into the California educational system.*

■ Education, including the assignment of pupils to schools, is plainly a state function. (See *Brown* v. *Board of Education* (1954) 347 U.S. 483, 493 [98 L.Ed. 873, 880, 74 S.Ct. 686, 38 A.L.R.2d 1180].) "The educa-

---

[12]See, e.g., *Wanner* v. *County School Board of Arlington County* (4th Cir. 1966) 357 F.2d 452, 454-455; *Dowell* v. *School Board of Oklahoma* (W.D.Okla. 1965) 244 F.Supp. 971, 981; *Swann* v. *Charlotte-Mecklenburg Board of Education* (W.D. N.C. 1970) 312 F.Supp. 503, 509-510, certiorari granted October 6, 1970; *Norwalk CORE* v. *Norwalk Board of Education* (D.Conn. 1969) 298 F.Supp. 213; *Offermann* v. *Nitkowski* (W.D.N.Y. 1965) 248 F.Supp. 129; *Booker* v. *Board of Education* (1965) 45 N.J. 161 [212 A.2d 1, 11 A.L.R.3d 754]; *Addabbo* v. *Donovan* (1965) 22 App.Div.2d 383 [256 N.Y.S.2d 178, 183-184]. Contra: *Lynch* v. *Kenston School District Board of Education* (N.D.Ohio 1964) 229 F.Supp. 740, 744; *Briggs* v. *Elliott* (E.D.S.C. 1955) 132 F.Supp. 776; *Barresi* v. *Browne* (1970) 226 Ga. 456 [175 S.E.2d 649, 651-652], certiorari granted, October 6, 1970.

[13]*Hunter* v. *Erickson* (1969) 393 U.S. 385, 392 [21 L.Ed.2d 616, 622, 89 S.Ct. 557]; *Bolling* v. *Sharpe* (1954) 347 U.S. 497, 499 [98 L.Ed. 884, 886, 74 S.Ct. 693]; see *Loving* v. *Virginia* (1967) 388 U. S. 1, 11 [18 L.Ed.2d 1010, 1017, 87 S.Ct. 1817].

tion of the children of the state is an obligation which the state took over to itself by the adoption of the constitution." (*Piper* v. *Big Pine School Dist.* (1924) 193 Cal. 664, 669 [226 P. 926].) To carry out this responsibility the state has created local school districts, whose governing boards function as agents of the state. (*Hall* v. *City of Taft* (1956) 47 Cal.2d 177, 181 [302 P.2d 574]; see *Becker* v. *Council of the City of Albany* (1941) 47 Cal.App.2d 702, 705 [118 P.2d 924].) These local boards historically and traditionally have undertaken the assignment of pupils to individual schools within the district. In *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876, 879 [31 Cal.Rptr. 606, 382 P.2d 878], we confirmed this authority, stating that: "A local board of education has power, in the exercise of reasonable discretion, to establish school attendance zones within the district, to determine the area that a particular school shall serve, and to require the students in the area to attend that school." (See Ed. Code, §§ 925, 1001, 1052, 29 Ops.Cal.Atty.Gen. 63 (1957).)

Section 1009.5, if applied to pupil assignments, would make the individual parents active participants in the pupil assignment process. Under such a construction, whenever the school board determined to assign a child to a school not within walking distance from his home, the board would be required to solicit parental consent. Presumably some parents would consent; others would not. The board must then reassign those children whose parents did not consent, reassign other children to make room for the first group, revise its transportation program to correspond to the re-assignments, and again solicit parental consents. Such a procedure may very likely condemn the possibility of removing racial imbalance in the schools. In any case, this process incorporates the consent of the parents as an integral part of the pupil assignment process, and thus into the California educational system.

 "It is obvious . . . that the general powers of the [school] board with respect to attendance zones are subject to the constitutional guaranties of equal protection and due process." (*Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876, 879 [31 Cal.Rptr. 606, 382 P.2d 878].) "[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." (*Evans* v. *Newton* (1966) 382 U.S. 296, 299 [15 L.Ed.2d 373, 377, 86 S.Ct. 486].)[14] Consequently, the parental decision to grant or withhold

---

[14] See *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715 [6 L.Ed.2d 45, 81 S.Ct. 856]; *Terry* v. *Adams* (1953) 345 U.S. 461, 489 [97 L.Ed. 1152, 1170, 73 S.Ct. 809]; *Smith* v. *Allwright* (1944) 321 U.S. 649, 663-665 [88 L.Ed. 987, 996-998, 64 S.Ct. 757, 151 A.L.R. 1110].

consent to pupil assignment, as an integral part of the educational structure, is subject to the provisions of the Fourteenth Amendment. A system that bestows governmental force upon a private decision to impose racial discrimination cannot stand.

█ Although at this point we analyze the statute upon its face, "[a] state enactment cannot be construed for purposes of constitutional analysis without concern for its immediate objective . . . and for its ultimate effect." (*Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 533-534 [50 Cal.Rptr. 881, 413 P.2d 825]; see *Castro* v. *State of California* (1970) 2 Cal.3d 223, 229 [85 Cal.Rptr. 20, 466 P.2d 244]; *Lee* v. *Nyquist* (W.D.N.Y. 1970) 318 F.Supp. 710.)[15] In the present case, we would be totally unrealistic to uphold section 1009.5 on an assumption that racial bias will play no role in the granting or withholding of parental consent. In view of the level of tension in the present society,[16] prejudices and objectives of racial separation will necessarily and significantly affect many parental decisions.

The net result is that section 1009.5, if it creates a parental power to refuse consent to pupil assignments, would beget a parental right to discriminate, and do so in a context of racial strife that would enable many to exploit that right to inflict racial prejudice. In the Proposition 14 cases (*Mulkey* v. *Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825], and *Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627]), an initiative measure gave an owner of real property "absolute discretion" to convey, or refuse to convey, the property to whomever he chose. We held that enactment unconstitutional, reasoning that "state authorization to discriminate was no less state action than state imposed discrimination." (64 Cal.2d at pp. 540-541.) The United States Supreme Court affirmed our judgment, characterizing the provision as an unconstitutional attempt to create a "right to discriminate." (387 U.S. at p. 381 [18 L.Ed.2d at p. 838].)[17]

---

[15]In *Hunter* v. *Erickson* (1969) 393 U.S. 385, 391 [21 L.Ed.2d 616, 622, 89 S.Ct. 557], the Supreme Court held unconstitutional a city housing ordinance, stating that "although the law on its face treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority."

[16]See generally the Report of the National Advisory Commission on Civil Disorders [Kerner Commission] (1969); see, e.g., *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498, fn. 4 [86 Cal.Rptr. 88, 468 P.2d 216].

[17]In *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715 [6 L.Ed.2d 45, 81 S.Ct. 856], a Delaware statute permitted a restaurateur to refuse to serve "persons whose reception or entertainment by him would be offensive to the major part of his customers." The majority found sufficient state involvement in the restaurant to render unconstitutional any exclusion of black customers. Justice Stewart, concurring, argued

In the Proposition 14 cases, dissenting opinions in this court and the United States Supreme Court argued that the Fourteenth Amendment applied only to state action, and that private decisions not to sell or lease property to a Negro lay beyond the scope of its prohibition.[18] No such argument can plausibly be raised in the present case. The assignment of pupils to various schools within a district has long been considered a state function; no one here contends to the contrary. If the state may not authorize private discrimination in the performance of a private function—and the Proposition 14 cases so held—it is plain that it may not authorize its functionaries to impose unconstitutional discrimination upon the performance of a state function. ██ Section 1009.5, if applied to pupil assignments, would in effect authorize parents, acting as state functionaries, to violate the Fourteenth Amendment. It would empower these private persons to inject the venom of racial discrimination into the veins of government. Such a statute would be unconstitutional on its face.

So interpreted, section 1009.5, as we shall now explain, likewise violates the Constitution in frustrating the extirpation of segregation in those school districts manifesting it.

c. ██ *If construed to require parental consent to the assignment of a student to a school beyond reasonable walking distance from his home, section 1009.5 would be unconstitutional if applied to districts manifesting racial segregation, whether de jure or de facto in character.*

In eliminating a principal instrument of desegregation section 1009.5 would impede to that extent the elimination of racial segregation in the schools. Since the United States Supreme Court has held that de jure segregation must be eradicated root and branch, the section transgresses that ruling. Moreover, so far as the section preserves even de facto segregation, by affording governmental support to such segregation, it casts the state itself in the unhappy role of the savior of de jure segregation, and fails constitutionally.

For districts which contain de jure segregation the mandate of the United States Supreme Court is express: school boards in such districts are "clearly charged with the affirmative duty to take whatever steps might be necessary

---

that the statute was unconstitutional on its face in that it gave the restaurateur and the majority of customers a right to discriminate on racial grounds. (365 U.S. at pp. 726-727 [6 L.Ed.2d at p. 53].)

[18]See *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 545 [50 Cal.Rptr. 881, 413 P.2d 825] (dissenting opn. of White, J.); *Reitman* v. *Mulkey* (1967) 387 U.S. 369, 387 [18 L.Ed.2d 830, 841, 87 S.Ct. 1627] (dissenting opn. of Harlan, J.).

to convert to a unitary system in which racial discrimination would be eliminated root and branch. . . . The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now." (*Green* v. *County School Board of New Kent County* (1968) 391 U.S. 430, 437-439 [20 L.Ed.2d 716, 723-724, 88 S.Ct. 1689].) Often the most effective program, and at times the only program, which will eliminate segregated schools requires pupil reassignment and busing.[19] ▮ Any enactment which obstructed a school board from carrying out its constitutional duty to eliminate segregation "root and branch," or compelled it to resort to less effective or ineffective means, would be plainly unconstitutional under the reasoning of *Green* v. *County School Board of New Kent County, supra.*

Closely on point is the decision of the three-judge federal court in *Swann* v. *Charlotte-Mecklenburg Board of Education* (W.D.N.C. 1970) 312 F.Supp. 503, probable jurisdiction noted October 6, 1970, which invalidated a North Carolina antibusing statute. The court held that: "Busing may not be necessary to eliminate a dual system and establish a unitary one in a given case, but we think the Legislature went too far when it undertook to prohibit its use in all factual contexts. To say that busing shall not be resorted to unless unavoidable is a valid expression of state policy, but to flatly prohibit it regardless of cost, extent, and all other factors—including willingness of a school board to experiment—contravenes, we think, the implicit mandate of *Green* that all reasonable methods be available to implement a unitary system." (312 F.Supp. at p. 510.)

▮ Since the U.S. Supreme Court has held that under the Constitution school boards in de jure segregated districts are "clearly charged with the affirmative duty to take whatever steps might be necessary" to eliminate segregation "root and branch," a statute which would proscribe a principal, and in some cases essential and exclusive step to achieve that end, must obviously violate constitutional requirements.

But amicus argues that the statute can be upheld with the exception of its possible application to de jure segregated districts. We do not believe, however, that the section can win piecemeal constitutionality. ▮ It is true that "We have recognized that a statute which has unconstitutional applications may nevertheless be effective in those instances where the Con-

---

[19]See *Swann* v. *Charlotte-Mecklenburg Board of Education* (4th Cir. 1970) 431 F.2d 138, 145, and dissenting opinion of Judge Winter, 431 F.2d at p. 157, certiorari granted October 6, 1970; *Kemp* v. *Beasley* (8th Cir. 1970) 423 F.2d 851; *United States* v. *Jefferson County Board of Education* (5th Cir. 1966) 380 F.2d 385, 392; *United States* v. *School Dist. 151 of Cook County, Illinois* (7th Cir. 1968) 404 F.2d 1125, 1130; *Keyes* v. *School Dist. No. 1, Denver, Colorado* (D.Colo. 1970) 313 F.Supp. 90.

stitution is not offended." (*Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 543 [50 Cal.Rptr. 881, 413 P.2d 825].) Yet, as we stated in *Franklin Life Ins. Co.* v. *State Board of Equalization* (1965) 63 Cal.2d 222, 227-228 [45 Cal.Rptr. 869, 404 P.2d 477], and reiterated in *Mulkey* v. *Reitman, supra:* "when the application of the statute is invalid in certain situations we cannot enforce it in other situations if such enforcement entails the danger of an uncertain or vague future application of the statute. . . . We have been particularly aware of fomenting such danger of uncertainty in the application of a statute which would inhibit the exercise of a constitutional right."

If we were to hold section 1009.5 constitutional other than as applied to districts manifesting de jure segregation, we would risk such "danger of an uncertain or vague future application of the statute," for the definition of de jure segregation has not been settled, nor its perimeters ascertained, and a school board could not definitively determine whether or not section 1009.5 applied to its district. The courts have not drawn a clear distinction between de facto and de jure segregation.[20] Some courts have defined de facto segregation as that resulting from residential patterns in a nonracially motivated neighborhood school system.[21] These residential patterns, however, may be in part the product of unconstitutional enforcement of restrictive racial covenants.[22] While such residential patterns were developing, moreover, the school board was collaterally engaged in reaching decisions respecting pupil assignments, attendance zones, transportation, and the location of new facilities, which decisions in turn necessarily influenced the racial composition of the residential areas.[23] Often a board decision, al-

[20]The validity of a distinction between de facto and de jure segregation is a much debated matter. That distinction has been utilized in *United States* v. *School Dist. 151 of Cook County, Illinois* (7th Cir. 1968) 404 F.2d 1125, 1130; *United States* v. *Jefferson County Board of Education* (5th Cir. 1966) 372 F.2d 836, 873, and the cases cited in footnote 26, *infra*, as holding that school districts have no duty to remedy de facto segregation. The distinction was rejected in *Beckett* v. *School Board of City of Norfolk* (E.D.Va. 1969) 308 F.Supp. 1274, 1304-1305; *Barksdale* v. *Springfield School Committee* (D.Mass. 1965) 237 F.Supp. 543, 546; Fiss, *Racial Imbalance in the Public Schools: the Constitutional Concepts* (1965) 78 Harv.L.Rev. 564, 584.

[21]*United States* v. *Jefferson County Board of Education* (5th Cir. 1967) 380 F.2d 385, 389, footnote 1; see *Bell* v. *School City of Gary* (7th Cir. 1963) 324 F.2d 209, 212-213; *Keyes* v. *School Dist. No. 1, Denver, Colorado* (D.Colo. 1970) 313 F.Supp. 61, 73-75.

[22]See *Swann* v. *Charlotte-Mecklenburg Board of Education* (4th Cir. 1970) 431 F.2d 138, 141, certiorari granted October 6, 1970; *Brewer* v. *School Board of City of Norfolk, Virginia* (4th Cir. 1968) 397 F.2d 37, 41-42; *Dowell* v. *School Board of Oklahoma City* (W.D.Okla. 1965) 244 F.Supp. 971, 976.

[23]See *Spangler* v. *Pasadena City Board of Education* (C.D.Cal. 1970) 311 F.Supp. 501, 522-524; *United States* v. *School District 151 of Cook County, Illinois* (N.D.Ill. 1968) 286 F.Supp. 786.

though based upon neutral principles, foreseeably will and does lead to increased school segregation. The weighing of the motive and effect of board decisions stretching back for many years to arrive at a net determination of the de facto or de jure character of the present structure presents a highly difficult and possibly insoluble task.

As a consequence of the above factors, any effort to determine the extent of de jure segregation in California would encounter enormous difficulty.[24] A federal district court has, indeed, found de jure segregation in the Pasadena School District. (*Spangler* v. *Pasadena City Board of Education* (C.D.Cal. 1970) 311 F.Supp. 501, 522-524; cf. *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876, 881 [31 Cal.Rptr. 606, 382 P.2d 878].) Petitioners and respondent both treat the racial structure of San Francisco schools as exemplifying de facto segregation, but the amicus curiae brief of the American Civil Liberties Union contends that it is de jure segregation.[25] Most school districts in California have not attempted to determine the character of segregation within their bounds, and any such determination would necessarily turn upon the uncertain definition of that elusive concept.

Thus under the current pattern of court decisions, neither school districts nor lower courts can determine with any confidence whether a pattern of school segregation should be classed as de facto or de jure. Consequently, if we held section 1009.5 unconstitutional only as applied to districts of de jure segregation, no school board in California (with the possible exception of the Pasadena School Board) could ascertain whether section 1009.5 could constitutionally apply within its district. Such a holding would, therefore, entail uncertain enforcement of section 1009.5, a confusion which would inhibit and delay school boards in their efforts to bring about full equality of educational opportunity. The *Green* decision calls for desegregation now; a statute which imports confusion and delay in the uprooting of de jure segregation violates both the rule prohibiting partial enforcement of legislation, when such enforcement entails the danger of vague future application, and the mandate of the Supreme Court of the United States.

Turning to de facto segregation, we cannot uphold section 1009.5 to the extent that it lends governmental support to such segregation. We recognize that the courts of other jurisdictions have reached differing decisions

---

[24]We note that until 1947 California Education Code sections 8003 and 8004 permitted school boards to segregate Indians and Orientals, although not Negroes. See *Mendez* v. *Westminister School Dist.* (S.D.Cal. 1946) 64 F.Supp. 544; 548.

[25]The de facto or de jure character of segregation in the San Francisco schools is currently the subject of litigation in the United States District Court for the Northern District of California (*Johnson* v. *San Francisco Unified School District,* Civ. No. 70-1331 SAW).

as to whether school boards bear an affirmative duty to eliminate de facto segregation.[26] This court, in *Jackson v. Pasadena City School Dist.* (1963) 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878], however, took a position squarely in favor of enforcing an affirmative duty to eradicate school segregation regardless of its cause. On page 881 of that opinion, then Chief Justice Gibson, forcefully stated: "So long as large numbers of Negroes live in segregated areas, school authorities will be confronted with difficult problems in providing Negro children with the kind of education they are entitled to have. Residential segregation is in itself an evil which tends to frustrate the youth in the area and to cause antisocial attitudes and behavior. Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause."

We need not, however, for the purposes of this case, rely on the affirmative duty to desegregate set forth in *Jackson*. The unconstitutionality of section 1009.5, if applied to pupil assignments in districts of de facto segregation, is deeper, more flagrant. Section 1009.5 does not assume a neutral stance respecting de facto segregation of schools; it moulds a medium of obstruction to the elimination of that evil. It prohibits the use of a method that may be essential to desegregation: pupil assignment without the requirement of parental consent. Yet the state cannot constitutionally countenance obstructionism, for once the state undertakes to preserve de facto school segregation, or to hamper its removal, such state involvement transforms the setting into one of de jure segregation.[27]

---

[26]The majority of cases reject the asserted affirmative duty to remedy de facto segregation; notable decisions are those of the Second Circuit (*Offermann v. Nitkowski* (2d Cir. 1967) 378 F.2d 22, 24 (dictum); Sixth Circuit (*Deal v. Cincinnati Board of Education* (6th Cir. 1966) 369 F.2d 55, 61-62); Seventh Circuit (*Bell v. School City of Gary* (7th Cir. 1963) 324 F.2d 209, 212) and the Tenth Circuit (*Board of Education of Oklahoma City Pub. Sch. v. Dowell* (10th Cir. 1967) 375 F.2d 158, 166 (dictum); *Downs v. Board of Education of Kansas City* (10th Cir. 1964) 336 F.2d 988, 998.) Federal district courts, however, have asserted this affirmative duty in the District of Columbia (*Hobson v. Hansen* (D.C. 1967) 269 F.Supp. 401, 506-508); Massachusetts (*Barksdale v. Springfield School Committee* (D.Mass. 1965) 237 F.Supp. 543, 546-547); Michigan (*Davis v. School District of City of Pontiac, Inc.* (E.D.Mich. 1970) 309 F.Supp. 734, 744); and New York (*Blocker v. Board of Education of Manhasset* (E.D.N.Y. 1964) 226 F.Supp. 208, 226-229; *Branche v. Board of Education of the Town of Hempstead* (E.D.N.Y. 1962) 204 F.Supp. 150, 153-154.)

[27]See *Lee v. Nyquist* (W.D.N.Y. 1970) 318 F.Supp. 710. See also *United States v. Montgomery County Board of Education* (1969) 395 U.S. 225, 235 [23

In *Spangler* v. *Pasadena City Board of Education* (C.D.Cal. 1970) 311 F.Supp. 501, the court held that school board decisions designed to preserve segregation based on neighborhood patterns created a de jure segregated system; the school board, it asserted, cannot "build up residential segregation, when that segregation is the result of either private or state enforced discrimination." (311 F.Supp. at p. 522.) In *Keyes* v. *School Dist. No. 1*, Denver, Colorado (D.Colo. 1970) 313 F.Supp. 61, the school board rescinded resolutions which established a program to reduce de facto segregation. Although the court held de facto segregation constitutional, the action of the school board, undertaken with the objective of preserving that segregation, was held unconstitutional. (313 F.Supp. at pp. 66-69.) In the analogous field of housing discrimination *Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627], although imposing no duty upon the state to end housing discrimination, held that an enactment barring such action was unconstitutional.

Pupil assignment to schools sufficiently distant to require bus transportation will often be the only effective device to eliminate de facto segregation.[28] The statute promulgates an absolute and irreversible prohibition of such assignments in the absence of parental approval. The statute erects this barrier without regard to the inequalities of the segregated schools, the educational advantages of integration, the ineffectiveness of alternative remedies, the cost of the program, or the desires of the majority of the students, parents, or the community. Hence, the state can hardly assert that its position is one of neutrality. By means of the statute, the state itself lends its awesome power to preserve the very segregation which the Constitution, as interpreted by the United States Supreme Court, has condemned.[29]

---

L.Ed.2d 263, 272, 89 S.Ct. 1670], in which the Supreme Court, in approving a plan for desegregation of teachers, asserted that "in this field the way must always be left open for experimentation."

[28]See On the Matter of Busing: A Staff Memorandum from the Center for Urban Education (Feb. 1970); United States Commission on Civil Rights (1967) Racial Isolation in the Public Schools, pages 196-197.

[29]An additional reason for construing section 1009.5 to avoid infringing upon the school board's power to assign students derives from the principle that whenever a statute is susceptible of two reasonable constructions, the courts should avoid that which creates serious inconvenience or impracticality. (See, e.g., *City of El Monte* v. *City of Industry* (1961) 188 Cal.App.2d 774, 782 [10 Cal.Rptr. 802]; *Reithardt* v. *Board of Education* (1941) 43 Cal.App.2d 629, 633 [111 P.2d 440].) The educational structure of California is not, and cannot be, so designed that every pupil is provided with a school within walking distance of his home. In rural areas almost all students travel by school bus; in urban regions the attendance zones of secondary schools often exceed a walking radius. Further, school boards often must assign students to schools outside their immediate neighborhood in order to relieve over-

4. ██ ██ *Section 1009.5, construed as a constitutional enactment, does not render unlawful the proposed pupil assignment and transportation plan of the Park South complex; therefore, the peremptory writ of mandate should issue.*

We have submitted that if interpreted to prohibit the nonconsensual assignment of a student to a school not within walking distance of his home, section 1009.5 runs afoul of constitutional stricture. A century of neglected reform has shown us that the virus of racial hatred endangers the health and unity of our society. We are now engaged in a great effort to rid us of that virus in every corner of our nation. We know that racial animosity chiefly develops in the child who is reared in an environment that festers it. We would keep our schools free from its contamination; indeed, our Supreme Court has said that our constitutional obligation compels the immediate cleansing of every school room where the law countenances its presence. How, then, can we uphold as constitutional a statute that categorically bars a principal and sometimes exclusive antidote to the spread and growth of this ugly toxin—a statute that in striking down one major method of wiping out desegregation in the school room, preserves and fosters and saves, to that extent, the segregation that this nation has covenanted to end?

We have therefore concluded that section 1009.5 must be construed to avoid any limitation on the authority of school boards in the assignment of pupils to their respective schools; that the section limits only the power of school districts to compel students to utilize any particular mode of transportation without parental consent. As we observed earlier, the Park South complex does not envision any regulation compelling students within the complex area to ride school buses, or use any particular method of traveling to school. Since the Park South complex thus presents no conflict with the provisions of section 1009.5, we conclude that the respondent was not justified in his refusal to proceed with computer programming needed to carry out that project.

Let a peremptory writ of mandate issue as prayed.

Peters, J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.**—I concur in the judgment and in those portions of the major-

---

crowding in particular structures, or to facilitate repair or remodeling. Thus a construction of section 1009.5 which permitted a parent to demand that a child be assigned to a school within walking distance of his home would, in effect, give the parents the right to demand impossible results. At the least, the efforts of school boards to accommodate such demands would create intolerable administrative expense and burden.

ity opinion which hold that Education Code section 1009.5 does no more than prohibit a school district from compelling students, without parental consent, to use means of transportation furnished by the district. However, I do not believe that the section is reasonably susceptible of being construed as undertaking to prohibit the board from assigning a student to a particular school without parental consent. Accordingly, it seems to me that we should defer consideration of issues of constitutionality of a statute involving parental consent to pupil assignment until such time as we may be confronted with such a statute.

Wright, C. J., and McComb, J., concurred.