[Civ. No. 1977. Fifth Dist. July 29, 1975.]

IRENE PENA, a Minor, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF KERN COUNTY, Respondent;
BOARD OF TRUSTEES OF THE DELANO
UNION ELEMENTARY SCHOOL DISTRICT et al.,
Real Parties in Interest.

COUNSEL

Mario Obledo, Charles F. Elsesser, Jr., Alan Exelrod, Michael Mendelsohn, Richard M. Pearl, Robert T. Olmos, Gene Livingston and Lucy McCabe for Petitioners.

No Appearance for Respondent.

Long & Levit, Bert W. Levit and Allan R. Moltzen for Real Parties in Interest.

OPINION

FRANSON, J.—

### STATEMENT OF THE CASE

On August 28, 1972, petitioners filed in the respondent court a petition for writ of mandate seeking to compel desegregation of the Delano Union Elementary School District. On October 30, 1972, real parties in interest filed a general demurrer to the petition.

On November 7, 1972, Proposition 21 (the Wakefield Anti-Busing Initiative) was passed by the California electorate.

On January 29, 1973, the demurrer was sustained without leave to amend.

On March 23, 1973, a petition to overturn the order sustaining the demurrer was filed in this court. An order to show cause was issued; oral arguments were held on July 11, 1973, and submission was deferred until the California Supreme Court ruled on the constitutionality of Proposition 21. On January 15, 1975, the Supreme Court held Proposition 21 to be in part unconstitutional. (*Santa Barbara Sch. Dist.* v. *Superior Court,* 13 Cal.3d 315 [118 Cal.Rptr. 637, 530 P.2d 605].) This case was re-calendared for May 14, 1975, and the matter was argued and submitted for decision on that date.

### FACTS

The action was brought in the trial court on behalf of racial minority students attending schools in the Delano Union Elementary School District. The purpose of the action was to compel the respondent board

of trustees to adopt and implement a plan which allegedly would provide an equal and quality education for the minority students.

In the first cause of action, petitioners alleged that they were forced to attend schools which were not integrated and as a consequence they suffered an inferior education. Specifically, they alleged that the district had a student population of 3,185 of which 31 percent were Anglo, 57 percent were Chicano, 5 percent were Black, and 7 percent were other non-Whites. The elementary school system consisted of six schools— three on the west side and three on the east side of Delano; the two "sides" of Delano were delineated by Highway 99. The 3 west-side schools were attended primarily by minority students (98 percent, 98 percent, and 97 percent non-Anglo), while the 3 east-side schools contained an Anglo enrollment significantly greater than the percentage of Anglos in the district as a whole (57 percent, 57 percent, and 45 percent Anglo). This racial imbalance was the result of the board of trustees' assigning students to attend their neighborhood schools.

It was also alleged in the first cause of action that the students were segregated by a racially discriminatory "tracking" system which resulted in intra-school segregation of classrooms. In addition, only 12 percent of the district teachers were minorities, no administrators were minorities, there were no bilingual administrative employees in 2 of the west-side schools, and the textbooks and institutional materials in use did not provide a realistic portrayal of minority groups.

It was alleged that the acts of segregation had resulted in educational harm as evidenced by a significant disparity in reading-skill levels of west-side students as compared with east-side students. At one west-side school the average sixth grader's reading proficiency was about two full grades below the average sixth grader at an east-side school, and the average fourth grader at the other two west-side schools was nearly one full grade behind his east-side counterpart.

Finally, it was alleged that the board of trustees had refused to take any action even though petitioners had presented an administratively feasible desegregation plan to the board as early as May 11, 1972. Basically, the plan called for re-drawing of attendance zones along an east/west axis rather than a north/south axis, and for the "pairing" of several schools (e.g., kindergarten and first grade attend one school, and second and third grades attend another).

The second cause of action incorporated the allegations of the first, and in addition alleged 14 specific acts of the school board and other governmental agencies that created or contributed to the existing racial segregation:

1. The board located new school-sites in areas which ensured that the attendance zones would be racially homogeneous.

2. The board strictly adhered to its "neighborhood school" policy in the face of segregated residential patterns caused by public and private discrimination.

3. The board failed to hire and retain minority teachers, administrators and clerical staff in numbers which reflected the racial composition of the district.

4. The board bused fifth graders, including several petitioners, from one west-side school to another west-side school even though an east-side school which was not at full capacity was closer; the effect of this was to compound racial imbalance when it could have been lessened.

5. In September 1964 the school board initiated a policy of double sessions for the west-side schoolchildren attending overcrowded Fremont School even though schools on the east side remained in single session with empty classrooms. After a public outcry, the policy was abandoned and the west-side students were bused to an east-side school until two new schools were built on the west side.

6. The board pursued the policy of ability-grouping or "tracking" which fostered racial segregation for the minority students attending east-side schools.

7. Governmental agencies compounded racial segregation in housing by locating nearly all of its low-rent and government-subsidized housing on the west side of Delano. Several of the petitioners were forced by economic reasons to live in that housing.

8. The board supposedly had been "studying" the problem of racial imbalance since 1969, but in fact had been ignoring state and federal laws and guidelines on school desegregation.

9. The board adopted an "open enrollment" policy which was never publicized or made available to a substantial number of minority

students; the effect was to shift the burden of providing equal education to the individual parents of the minority students.

10. The great disparity in levels of achievement between east-side and west-side students increased as segregation continued.

11. The board failed to implement after adoption a master plan prepared by paid consultants several years prior to the institution of this suit which would have made Cecil Avenue School the intermediate school for the entire district, and which would have decreased racial segregation. This also was suggested in petitioners' desegregation plan.

12. Despite its legal responsibility, the board yielded to community pressure to put off any action to integrate the schools.

13. The board's neighborhood school policy compelled west-side minority students to attend schools with inferior and inadequate facilities as compared with east-side schools.

14. The board refused to adopt or discuss the feasible integration plan presented by petitioner Committee For Equity on May 11, 1972.

The prayer of the petition called for elimination of the racial imbalance in the district; increasing the number of minority faculty, administrators, and staff to reflect the racial makeup of the student population; elimination of classroom segregation ("tracking") unless there is some compelling educational reason for it; and provision for multicultural studies, curriculum, and bilingual studies program.

### CAUSE OF ACTION FOR RELIEF
### FROM DE JURE SEGREGATION

In *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315, our Supreme Court held that the new Education Code section 1009.6, added by Proposition 21,[1] was unconstitutional as applied to school districts manifesting either de jure or de facto segregation. The court, however, upheld those portions of Proposition 21 which repealed Education Code sections 5002 and 5003 and Administrative Code, title 5, sections 14020

---

[1]Proposition 21 (the Wakefield Anti-Busing Amendment) purported to add to the Education Code section 1009.6 which provided: "No public school student shall, because of his race, creed, or color, be assigned to or be required to attend a particular school."

and 14021.[2] In holding this part of Proposition 21 to be severable and constitutional, the court reasoned that the repealed provisions which had provided for racial balance to be determined according to a precise statutory formula were not constitutionally required, but were a matter of state policy; hence, the effect of their repeal was to end a direct state involvement in eliminating racial imbalance in the schools and allowing local control, subject only to constitutional mandate. (13 Cal.3d at pp. 330-332.)

■    The constitutional duty of local school districts to eliminate de jure racial segregation is clear. In *Keyes* v. *School District No. 1, Denver, Colo.,* 413 U.S. 189 [37 L.Ed.2d 548, 93 S.Ct. 2686], the Supreme Court defined de jure segregation as a "current condition of segregation resulting from intentional state action." (413 U.S. at p. 205 [37 L.Ed.2d at pp. 561-562, 93 S.Ct. at p. 2696].) In that case it was alleged that the school district acted with the intent or purpose to segregate when it constructed a new, small elementary school in the middle of a Black community, gerrymandered school attendance zones, drafted student assignment and transfer policies, utilized so-called "optional attendance zones," made excessive use of mobile classroom units and assigned minority teachers and staff only to minority schools. The school district sought to justify racial concentrations as resulting only from its "neighborhood school policy." The court held, however, that the mere assertion of a neighborhood policy was not dispositive where there was proof that school authorities practiced de jure segregation by "techniques that indicate that the 'neighborhood school' concept has not been maintained free of manipulation." (413 U.S. at p. 212 [37 L.Ed.2d at p. 565, 93 S.Ct. at p. 2699].) It was held that proof of intentionally segregative school board action in a meaningful portion of the school system creates a presumption that other segregated schooling is also de jure and the burden shifts to the school authorities to show that the other segregated schools within the district are not the result of intentionally segregative acts. (413 U.S. at p. 207 [37 L.Ed.2d at p. 562, 93 S.Ct. at p. 2697].)

Similarly, in *Milliken* v. *Bradley,* 418 U.S. 717 [41 L.Ed.2d 1069, 94 S.Ct. 3112], involving racial segregation in the Detroit public school

---

[2]Education Code sections 5002 and 5003 and Administrative Code sections 14020 and 14021 provided that the state policy was to prevent and eliminate racial and ethnic imbalance in public schools and provided that public school boards were to consider for guidance the percentage variations among grades, schools and areas of the districts and population zones, and that racial imbalance would be indicated if the percentage racial or ethnic composition of any school differed significantly from the district-wide percentage.

system, the court stated that there was evidence of de jure segregation where the school district used optional attendance zones in areas of racial transition and between areas of opposite predominant racial compositions, where Black students had been bused to Black schools when White schools with available space were closer, whereas White students had never been bused to Black schools even though many were unattended, and where the great majority of new schools were constructed in either overwhelmingly Black or all-White neighborhoods. (418 U.S. at pp. 725-726 [41 L.Ed.2d at pp. 1080-1081, 94 S.Ct. at pp. 3117-3118].)

In *Jackson v. Pasadena City School Dist.,* 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878], the California Supreme Court held that a petition stated a cause of action for relief from de jure segregation by alleging that the school board drew attendance-zone lines for the purpose of instituting and maintaining racial segregation, in that a substantial portion of Black students attended a single school whereas most White students were able to avoid attending "Black" schools even though those schools were closer than any "White" schools. In a later case, the court added that when the "state undertakes to preserve de facto school segregation, or to hamper its removal, such state involvement transforms the setting into one of de jure segregation." (*San Francisco Unified School Dist. v. Johnson,* 3 Cal.3d 937, 958 [92 Cal.Rptr. 309, 479 P.2d 669]; see also *People* ex rel. *Lynch v. San Diego Unified School Dist.,* 19 Cal.App.3d 252, 264 [96 Cal.Rptr. 658].)

██ Real party in interest contends that petitioners have failed to state a cause of action for de jure segregation because they failed to allege that the racial imbalance in those schools was the intended result of the various acts. In testing the sufficiency of a pleading against a general demurrer, all well-pleaded allegations, including those that arise by reasonable inference, are deemed admitted. The allegations are to be liberally construed with a view to substantial justice between the parties. (Code Civ. Proc., § 452; *Universal By-Products, Inc. v. City of Modesto,* 43 Cal.App.3d 145, 151 [117 Cal.Rptr. 525].)

While the words "intent" or "intentional" do not appear in the petition, nevertheless an intent to maintain the racial imbalance is reasonably inferred from the pleadings.

In their second cause of action petitioners incorporated the allegations of racial imbalance throughout the school as alleged in their first cause of action and alleged that the segregation was created and perpetuated by the official acts of the board of trustees including the fact that the board

ignored state and federal laws and guidelines on segregation. It is also alleged that the board refused to consider a feasible desegregation plan submitted by one of the petitioners, that it adopted but failed to implement a plan submitted by a paid consultant that would have resulted in some degree of desegregation, that at one time west-side schools were on double sessions while east-side schools had empty classrooms, that west-side students were bused from one crowded west-side school to another west-side school when an east-side school with space available was closer, and that the board "located new school sites·in areas which would ensure that the attendance zones for the schools would be racially homogenous." A segregative intent or purpose reasonably can be inferred from these allegations.

Petitioners have stated a cause of action for relief from de jure segregation.

### CAUSE OF ACTION FOR RELIEF FROM DE FACTO SEGREGATION

While the federal rule appears otherwise, our California Supreme Court repeatedly has indicated by way of dicta that school districts have an affirmative duty to eliminate de facto as well as de jure segregation. In *Jackson v. Pasadena City School Dist., supra,* 59 Cal.2d 876, it is stated: " . . . even in the absence of gerrymandering or other affirmative discriminatory conduct by a school board, a student under some circumstances would be entitled to relief where, by reason of residential segregation, substantial racial imbalance exists in his school. . . . Residential segregation is in itself an evil which tends to frustrate the youth in the area and to cause antisocial attitudes and behavior. Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause." (59 Cal.2d at p. 881.) (See also *Santa Barbara Sch. Dist. v. Superior Court, supra,* 13 Cal.3d 315 at pp. 327-331; *Serrano v. Priest,* 5 Cal.3d 584, 604 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; *San Francisco Unified School Dist. v. Johnson, supra,* 3 Cal.3d 937 at pp. 956-958; *Mulkey v. Reitman,* 64 Cal.2d 529, 537 [50 Cal.Rptr. 881, 413 P.2d 825].)

In *People* ex rel. *Lynch* v. *San Diego Unified School Dist., supra,* 19 Cal.App.3d 252, hearing denied by Supreme Court on October 6, 1971, it is stated that there is a denial of equal opportunity in de facto segregation where the imbalance "affects the educational opportunities of the minority group." (19 Cal.App.3d at pp. 265-266.) Stated otherwise, a cause of action for relief from de facto segregation is stated when the plaintiff alleges actual educational harm to the minority students as a result of the segregation.

In the first cause of action, petitioners allege that extensive racial imbalance existed among the six schools in the district and that it resulted from the board's neighborhood school policy. The petition further alleged that the schools were segregated by means of an internal "tracking" system, that there was a paucity of minority teachers and administrators despite a majority of minority students in the district, and that the curriculum was racially discriminatory. Finally, petitioners allege that they have suffered educational harm in that the minority students from the west-side schools scored significantly lower in reading tests than did the students from the east-side schools. Thus, apart from the dicta of the California Supreme Court, under the authority of *People* ex rel. *Lynch* v. *San Diego Unified School Dist., supra,* petitioners have stated a cause of action for relief from de facto segregation.

We deem it unnecessary to discuss petitioners' other contentions concerning their first cause of action.

It is ordered that a peremptory writ of mandate issue directing the respondent court to set aside its order sustaining the general demurrer to the petition and to allow petitioners to proceed to a trial on the merits on their causes of action for relief from the alleged acts of de jure and de facto segregation.

Brown (G. A.), P. J., and Gargano, J., concurred.